**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

━━━━━━━━━━━━━━━━━━━━━━━

ATLAS DATA PRIVACY                 CIVIL ACTION:
CORPORATION, et al.,
                                   NO. 24-3993
        v.

BLACKBAUD, INC., et al.
━━━━━━━━━━━━━━━━━━━━━━━━━━

ATLAS DATA PRIVACY                 CIVIL ACTION:
CORPORATION, et al.,
                                   NO. 24-3998
        v.

WHITEPAGES, INC., et al.
━━━━━━━━━━━━━━━━━━━━━━━━━━

ATLAS DATA PRIVACY
CORPORATION, et al.,                CIVIL ACTION:

        v.                          NO. 24-4000

HIYA, INC., et al.
━━━━━━━━━━━━━━━━━━━━━━━━━━

ATLAS DATA PRIVACY
CORPORATION, et al.,                CIVIL ACTION:

        v.                          NO. 24-4073

COMMERCIAL REAL ESTATE
EXCHANGE, INC., et al.
━━━━━━━━━━━━━━━━━━━━━━━━━━

**MOTION**

October 22, 2024


Sharon Ricci, Official Court Reporter
Sharon.ricci.usdcnj@gmail.com
267-249-8780
Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.

```
1   ────────────────────────
2   ATLAS DATA PRIVACY
    CORPORATION, et al.,              CIVIL ACTION:
3
         v.                          NO. 24-4077
4
    CARGO GROUP, INC., et al.
5   ────────────────────────
6   ATLAS DATA PRIVACY
    CORPORATION, et al.,              CIVIL ACTION:
7
         v.                          NO. 24-4095
8
    TWILIO INC., et al.
9   ────────────────────────
10  ATLAS DATA PRIVACY
    CORPORATION, et al.,              CIVIL ACTION:
11
         v.                          NO. 24-4104
12
    6SENSE INSIGHTS, INC.,
13  et al.
14  ────────────────────────
    ATLAS DATA PRIVACY
15  CORPORATION, et al.,              CIVIL ACTION:
16       v.                          NO. 24-4105
17  LIGHTBOX PARENT, L.P.,
    et al.
18  ────────────────────────
19  ATLAS DATA PRIVACY
    CORPORATION, et al.,              CIVIL ACTION:
20
         v.                          NO. 24-4106
21
    SEARCH QUARRY, LLC, et al.
22  ────────────────────────
23
24
25
```

```
 1    ─────────────────────────────

 2    ATLAS DATA PRIVACY
      CORPORATION, et al.,              CIVIL ACTION:
 3
            v.                          NO. 24-4107
 4
      ACXIOM, LLC, et al.
 5    ─────────────────────────────

 6    ATLAS DATA PRIVACY
      CORPORATION, et al.,              CIVIL ACTION:
 7
            v.                          NO. 24-4110
 8
      ENFORMION, LLC, et al.,
 9    ─────────────────────────────

10    ATLAS DATA PRIVACY
      CORPORATION, et al.,              CIVIL ACTION:
11
            v.                          NO. 24-4111
12
      COSTAR GROUP, INC., et al.,
13    ─────────────────────────────

14    ATLAS DATA PRIVACY
      CORPORATION, et al.,              CIVIL ACTION:
15
            v.                          NO. 24-4112
16
      ORACLE INTERNATIONAL
17    CORPORATION, et al.

18    ─────────────────────────────

19    ATLAS DATA PRIVACY
      CORPORATION, et al.,              CIVIL ACTION:
20
            v.                          NO. 24-4113
21
      RED VIOLET, INC., et al.
22    ─────────────────────────────

23    ATLAS DATA PRIVACY
      CORPORATION, et al.,              CIVIL ACTION:
24
            v.                          NO. 24-4114
25
      RE/MAX, LLC, et al.
      ─────────────────────────────
```

```
1   ─────────────────────────────
2   ATLAS DATA PRIVACY
    CORPORATION, et al.,            CIVIL ACTION:
3
        v.                          NO. 24-4168
4
    EPSILON DATA MANAGEMENT, LLC
5   et al.
6   ─────────────────────────────
7   ATLAS DATA PRIVACY
    CORPORATION, et al.,            CIVIL ACTION:
8
        v.                          NO. 24-4171
9
    PEOPLE DATA LABS, INC.,
10  et al.
    ─────────────────────────────
11
    ATLAS DATA PRIVACY
12  CORPORATION, et al.,            CIVIL ACTION:

13      v.                          NO. 24-4175
14
    CLARITAS, LLC, et al.
15  ─────────────────────────────
    ATLAS DATA PRIVACY
16  CORPORATION, et al.,            CIVIL ACTION:

17      v.                          NO. 24-4181
18
    DATA AXLE, INC., et al.
19  ─────────────────────────────
    ATLAS DATA PRIVACY
20  CORPORATION, et al.,            CIVIL ACTION:

21      v.                          NO. 24-4182
22
    REMINE INC., et al.
23  ─────────────────────────────

24

25
```

1  —————————————————————

2  ATLAS DATA PRIVACY
   CORPORATION, et al.,              CIVIL ACTION:
3
         v.                          NO. 24-4184
4
   LUSHA SYSTEMS, INC., et al.
5  —————————————————————

6  ATLAS DATA PRIVACY
   CORPORATION, et al.,              CIVIL ACTION:
7
         v.                          NO. 24-4217
8
   TELTECH SYSTEMS, INC., et al.
9  —————————————————————

10 ATLAS DATA PRIVACY
   CORPORATION, et al.,              CIVIL ACTION:
11
         v.                          NO. 24-4227
12
   PEOPLECONNECT, INC., et al.
13 —————————————————————

14 ATLAS DATA PRIVACY
   CORPORATION, et al.,              CIVIL ACTION:
15
         v.                          NO. 24-4230
16
   CORELOGIC, INC., et al.
17 —————————————————————

18 ATLAS DATA PRIVACY
   CORPORATION, et al.,              CIVIL ACTION:
19
         v.                          NO. 24-4233
20
   BLACK KNIGHT TECHNOLOGIES,
21 LLC, et al.
22 —————————————————————

   ATLAS DATA PRIVACY
23 CORPORATION, et al.,              CIVIL ACTION:

24       v.                          NO. 24-4269

25 THOMSON REUTERS CORPORATION,
   et al.

1   _____

2   ATLAS DATA PRIVACY
    CORPORATION, et al.,              CIVIL ACTION:
3
            v.                        NO. 24-4271
4
    CHOREOGRAPH, LLC, et al.
5   _____

6   ATLAS DATA PRIVACY
    CORPORATION, et al.,              CIVIL ACTION:
7
            v.                        NO. 24-4288
8
    TRANSUNION, LLC, et al.
9   _____

10  ATLAS DATA PRIVACY
    CORPORATION, et al.,              CIVIL ACTION:
11
            v.                        NO. 24-4298
12
    EQUIFAX INC., et al.
13  _____

14  ATLAS DATA PRIVACY
    CORPORATION, et al.,              CIVIL ACTION:
15
            v.                        NO. 24-4299
16
    SPOKEO, INC., et al.
17  _____

18  ATLAS DATA PRIVACY
    CORPORATION, et al.,              CIVIL ACTION:
19
            v.                        NO. 24-4354
20
    TELNYX, LLC, et al.
21  _____

22  ATLAS DATA PRIVACY
    CORPORATION, et al.,              CIVIL ACTION:
23
            v.                        NO. 24-4392
24
    MYHERITAGE, LTD., et al.
25  _____

```
1    ─────────────────────────

2    ATLAS DATA PRIVACY
     CORPORATION, et al.,              CIVIL ACTION:
3
           v.                         NO. 24-4442
4
     WILAND, INC., et al.
5    ─────────────────────────

6    ATLAS DATA PRIVACY
     CORPORATION, et al.,              CIVIL ACTION:
7
           v.                         NO. 24-4447
8
     ATDATA, LLC, et al.
9    ─────────────────────────

10   ATLAS DATA PRIVACY
     CORPORATION, et al.,              CIVIL ACTION:
11
           v.                         NO. 24-4571
12
     PRECISELY HOLDINGS, LLC,
13   et al.

14   ─────────────────────────

     ATLAS DATA PRIVACY
15   CORPORATION, et al.,              CIVIL ACTION:

16         v.                         NO. 24-4696

17   OUTSIDE INTERACTIVE, INC.

18   ─────────────────────────

     ATLAS DATA PRIVACY
19   CORPORATION, et al.,              CIVIL ACTION:

20         v.                         NO. 24-4770

21   VALASSIS DIGITAL CORP., et
     al.
22   ─────────────────────────

23

24

25
```

United States District Court
District of New Jersey

```
1    ――――――――――――――――――――

2    ATLAS DATA PRIVACY
     CORPORATION, et al.,              CIVIL ACTION:
3
            v.                         NO. 24-4850
4
     THE LIFETIME VALUE CO. LLC,
5    et al.

6    ――――――――――――――――――――

7    ATLAS DATA PRIVACY
     CORPORATION, et al.,              CIVIL ACTION:
8
            v.                         NO. 24-5334
9
     FIRST AMERICAN FINANCIAL
     CORPORATION, et al.
10   ――――――――――――――――――――

11   ATLAS DATA PRIVACY
     CORPORATION, et al.,              CIVIL ACTION:
12
            v.                         NO. 24-6160
13
     LEXISNEXIS RISK DATA
14   MANAGEMENT, LLC, et al.

15   ――――――――――――――――――――

16
     Mitchell H. Cohen Building & U.S. Courthouse
17   4th & Cooper Streets
     Camden, New Jersey  08101
18   October 22, 2024
     Commencing at 9:58 a.m.
19

20   B E F O R E:             THE HONORABLE HARVEY BARTLE, III,
                              UNITED STATES DISTRICT JUDGE
21

22   A P P E A R A N C E S:

23
          BOIES SCHILLER FLEXNER LLP
24        BY: ADAM R. SHAW, ESQUIRE
          30 South Pearl Street, 12th Floor
25        Albany, New York 12207
          For the Plaintiffs
```

**APPEARANCES CONTINUED:**

```
     PEM LAW LLP
     BY:  RAJIV D. PARIKH, ESQUIRE
     1 Boland Drive, Suite 101
     West Orange, New Jersey 07052
     For the Plaintiffs


     TROUTMAN PEPPER HAMILTON SANDERS LLP
     BY:  ANGELO A. STIO III, ESQUIRE
     301 Carnegie Center, Suite 400
     Princeton, New Jersey 08543
     For the Defendants CARCO Group Inc.; Acxiom, LLC; AtData,
     LLC; Deluxe Corporation; DM Group, Inc.; Enformion, LLC;
     Red Violet, Inc.; Remine Inc.; RocketReach LLC; CoreLogic
     Inc.


     HOGAN LOVELLS US LLP
     BY:  DAVID M. CHEIFETZ, ESQUIRE
     390 Madison Avenue
     New York, New York 10017
     For the Defendant Lifetime Value Co. LLC


     PARKER POE ADAMS & BERNSTEIN, LLP
     BY:  SARAH F. HUTCHINS, ESQUIRE
     BY:  CORRI A. HOPKINS, Esquire
     620 South Tryon Street, Suite 800
     Charlotte, North Carolina 28202
     For the Defendant Blackbaud, Inc.


     SIDLEY AUSTIN LLP
     By:  TYLER J. DOMINO, ESQUIRE
     787 Seventh Avenue
     New York, New York 10019
     For the Defendant MyHeritage (USA), Inc.


     McCARTER & ENGLISH, LLP
     BY:  SCOTT S. CHRISTIE, ESQUIRE
     Four Gateway Center
     100 Mulberry Street
     Newark, New Jersey 07102
     For the Defendant Black Knight Technologies, LLC and
     Black Knight, Inc.
```

*United States District Court*
*District of New Jersey*

**APPEARANCES CONTINUED:**

```
        BALLARD SPAHR LLP
        BY:  MARCEL S. PRATT, ESQUIRE
        BY:  MICHAEL BERRY, ESQUIRE
        1735 Market Street, 51st Floor
        Philadelphia, Pennsylvania 19103
        For the Defendant Thomson Reuters


        VEDDER PRICE, P.C.
        BY:  BLAINE C. KIMREY, ESQUIRE
        222 North LaSalle Street
        Chicago, Illinois 60601
        For the Defendants Whitepages, Inc. and Hiya, Inc.,
        et al.


        LOWENSTEIN SANDLER LLP
        By:  RASMEET K. CHAHIL, Esquire
        One Lowenstein Drive
        Roseland, New Jersey 07068
        For the Defendant LexisNexis Risk Data Management, LLC


        MCCARTER & ENGLISH LLP
        BY:  RYAN SAVERCOOL, Esquire
        Four Gateway Center
        100 Mulberry Street
        Newark, NJ 07102
        For the Defendant The Lifetime Value Co.


        TRESSLER LLP
        BY:  GEORGE ZACHARY TWILL, Esquire
        163 Madison Avenue, Suite 404
        Morristown, NJ 07960
        For the Defendant Data Axle, Inc.


        BUCHANAN INGERSOLL & ROONEY PC
        BY:  SAMANTHA L. SOUTHALL, ESQUIRE
        50 S. 16th Street, Suite 3200
        Philadelphia, PA 19102
        For the Defendant TransUnion and Zillow Group
```

**APPEARANCES CONTINUED:**

        KELLEY DRYE & WARREN LLP
        BY:  AARON J. GOLD, ESQUIRE
        BY:  WHITNEY SMITH, ESQUIRE
        3 World Trade Center
        175 Greenwich Street
        New York, NY 10007
        For the Defendant RE/MAX LLC


        FAEGRE DRINKER BIDDLE & REATH LLP
        BY:  KEVIN DEMAIO, ESQUIRE
        600 Campus Drive
        Florham Park, NJ 07932
        For the Defendant Epsilon Data Management, LLC;
        Conversant LLC; and Citrus Ad International, Inc.


**A L S O   P R E S E N T:**


        David Bruey, Courtroom Deputy

        Ryan Rose, Judicial Law Clerk




(Further appearances of counsel are listed on sign-in sheet,
Attachment 1, to the docket minute entry.)

                                - - -

```
 1              (Proceedings held in open court before The

 2    Honorable Harvey Bartle, III, United States District Judge, at

 3    9:58 a.m.)

 4              THE COURT:  Good morning.

 5              RESPONSE:  Good morning, Your Honor.

 6              THE COURT:  You may be seated.  The Court is hearing

 7    oral argument this morning on the motion to remand in the

 8    various Atlas cases.

 9              Mr. Shaw, are you going to be the lead-off?

10              MR. SHAW:  I am, Your Honor.  Good morning.

11              THE COURT:  Good morning.

12              MR. SHAW:  Thank you.  Your Honor, Adam Shaw for the

13    plaintiffs.

14              Your Honor, it's a little bit odd, the burdens here,

15    because even though we're -- we made the motion to remand --

16              THE COURT:  That's true.

17              MR. SHAW:  -- they made the removal motion and --

18              THE COURT:  You decide who goes first?

19              MR. SHAW:  Well, I was going to say if I could just

20    hit some highlights and then reserve some time to come back and

21    argue.

22              THE COURT:  We're going to be going back and forth,

23    that's --

24              MR. SHAW:  Yeah.  So I think just briefly, so as Your

25    Honor knows, there's 70-some-odd cases that are in this court.
```

```
 1          THE COURT:  Right.
 2          MR. SHAW:  40 or so -- it's changed a little bit, but
 3  40 or so are subject to remand.
 4          THE COURT:  Right.
 5          MR. SHAW:  So without a doubt, 30 or so are staying
 6  with this court.  And we're going to be here before Your Honor
 7  and, frankly, we're pleased about that.  And we didn't make
 8  this motion to remand to get out of federal court because we're
 9  going to be here anyway.
10          But as you know, there's some cases, even one of the
11  cases that's been brought up in these arguments, Attorneys
12  Trust, where you can get into this weird situation where the
13  parties take it all the way to the end and then somebody says,
14  oh, my God, there wasn't jurisdiction here.
15          THE COURT:  That would be a problem.
16          MR. SHAW:  That would be a problem.  So that's why we
17  raised it when we did.
18          And also, you know, the allegation in the removal
19  motion was, in our mind, a fiction, that we did it for those
20  reasons.  So --
21          THE COURT:  I'm not offended because you made a motion
22  to remand.
23          MR. SHAW:  Thank you, Your Honor.
24          So just briefly, one aspect of the motion is whether
25  Atlas's citizenship should be disregarded for purposes of
```

1  determining diversity.  And the basis for that is not really

2  under 28 U.S.C. 1359, but kind of because that's the statute

3  that deals with kind of looking past the party to try to figure

4  out whether there was a collusive assignment or mechanism for

5  getting into federal court.

6          THE COURT:  Right.

7          MR. SHAW:  And it's been looked to situations where

8  people try to avoid federal court.  But the essential nature of

9  it is this is a court of limited jurisdiction.  Sometimes

10  people get into stratagems to try to get here or get out of

11  here, but the whole idea is, is it a stratagem?  Was that the

12  purpose of the relationship of the parties?

13          So regardless of which case you look at or which

14  factor that you look at, it's all in service of Your Honor

15  trying to figure out whether somebody's manipulating --

16          THE COURT:  It's a fact-bound inquiry.

17          MR. SHAW:  It's a fact-bound inquiry, but I would say

18  there's no set factors that you should look at.  They make a

19  lot of hay about whether it's a partial assignment or a full

20  assignment and, frankly, Your Honor, I don't think you have to

21  go too far down that route because, regardless, that may be in

22  their minds sufficient, but it's not -- sorry, that may be

23  necessary, but it's not sufficient.  That fact alone, whether

24  it's partial or full, doesn't mean that it's collusive.  You

25  have to look at all of the facts here.

```
 1              And I think if you do look at all of the facts here,
 2    it will be very clear that this is not a stratagem to try to
 3    avoid federal court.  They want to try to point to the Grassi
 4    factors named after a Grassi case.  That's fine if you want to
 5    try to look through those.  But, you know, if you go through
 6    those, you'll see this has nothing to do really with the
 7    situation in Grassi.  I think Grassi and the other case they
 8    point to, Attorneys Trust, the assignors were part of the case.
 9    The assignors controlled the litigation.  The assignors, you
10    know, had this present stake.  The assignors tried to avoid
11    jurisdiction.
12              It's very clear in those facts of those cases.  I
13    think the parties admitted it in those cases.  And if not, you
14    know, the court kind of sussed it out.  And that was kind of
15    the factual circumstances, and that's just not here.  There's
16    nothing here, you know, that even suggests that -- first of
17    all, the assignors have no role in this case.  Second of all,
18    the idea that somehow these assignors knew about the
19    jurisdiction of this court and tried to deal with the
20    assignment in a way to avoid it, it just makes no sense at all.
21              So that's our high-level statement on that.
22              THE COURT:  Well, we have issues involving 1332(a),
23    correct?
24              MR. SHAW:  Correct.
25              THE COURT:  Some of the removals were based on that.
```

 1   Others were based on 1332(d), CAFA, and the mass tort

 2   provisions.

 3          MR. SHAW:  Correct.

 4          THE COURT:  So with 1332(a), isn't the first step to

 5   determine whether Atlas is a real party in interest so that

 6   it's -- so its citizenship is relevant?  That's the first step

 7   under 1332(a).

 8          And then you get into the issue of whether an assignee

 9   could be a real party in interest.  And assuming that Atlas is

10   a real party in interest, then you get to the question of

11   collusion.

12          So it's really a two-step process, isn't it, under

13   1332(a)?

14          MR. SHAW:  Yes, Your Honor.  And I apologize, I kind

15   of skipped that first step because I don't think anybody's

16   controverting that the assignments took place here.  But yes,

17   that is correct.

18          THE COURT:  They do argue, I think, that -- nobody's

19   arguing that the assignments didn't take place, but it's the

20   legal effect of whether they're a real party in interest, and I

21   think maybe that's resolved by the *Sprint* case in the Supreme

22   Court.

23          So then you get to the question of whether -- even if

24   somebody is a real party in interest or has standing, the

25   question is, was the jurisdiction manufactured, be coming here

1    just for that purpose?

2          And so that's what you were addressing, the collusive

3    aspect of it?

4          MR. SHAW:  Yes, Your Honor, exactly.  Thank you.  It

5    is those two steps.  As I said, I went past the first step.

6          I do believe that the assignments are valid and that,

7    you know, the Court -- I don't even think the role on a 1332 is

8    to kind of look behind those to try to figure out, you know,

9    whether it's valid under state law and kind of the -- the

10   things.  But yes, you do have to make some initial

11   determination that Atlas is a real party because -- as an

12   assignment, and then you move on to the next step.

13         THE COURT:  Right.

14         MR. SHAW:  So then Your Honor mentioned the other part

15   of this case has to do with is there some other reason that

16   there's not jurisdiction here.  They've proffered CAFA.  Under

17   CAFA, there's really two arguments.

18         One, they say you look to not the plaintiff that's

19   named in this case, Atlas here, but you look to all of the

20   assignors that are out there that are parties in interest, so

21   to speak, and you look --

22         THE COURT:  Isn't that the class action aspect you're

23   talking about?

24         MR. SHAW:  No, right now I'm talking about --

25         THE COURT:  The mass action?

```
 1              MR. SHAW:  The mass action aspect.

 2              THE COURT:  Okay.  Go ahead.

 3              MR. SHAW:  Under the mass action aspect case of it,

 4    there's a case in the Supreme Court called *Hood*.  And the *Hood*

 5    case says very clearly you do not look past the named plaintiff

 6    in the case.  The *Hood* case makes it very clear that that's the

 7    way the statute is set up; that you have to read the statute

 8    that way; it makes a distinction between the term "plaintiff"

 9    in one part of the statute and some other terms in the statute;

10    it makes it clear that even though in that case it was a state

11    suing on behalf of its citizens, that that was not a

12    controlling or even significant reason to read the mass action

13    part of the statute differently.

14              They say you read it for its plain terms, and its

15    plain terms said "plaintiff," and you look to the plaintiff,

16    you don't look behind it.  They didn't look behind it in the

17    *Hood* case where there was citizens behind the state, and they

18    haven't looked behind it in various other cases that we

19    submitted in our brief.  Situations where there's like an

20    insurance subrogee, situations where there's a corporation

21    suing on behalf of some kind of security holders, and other

22    types of situations like that.  You look to the plaintiff.

23              So we would say that the *Hood* case is controlling in

24    that aspect.  They say you don't read *Hood* that way and that

25    you -- somehow *Hood* is very narrow in the situation of a parens
```

1  patriae.  We don't read it that way and we think that that case

2  is controlling.

3          The other thing that they raise is the class action

4  part of the CAFA case.  There we also see this case as fairly

5  stark.  The class action part of the CAFA statute says that if

6  there's a case that's brought under some kind of analogue to

7  Rule 23, in other words, some kind of representative action

8  that has a procedure that's like Rule 23, then you can call it

9  a class action, but it has to be brought under one of those

10 types of rules.

11         It can't -- and here, the Daniel's Law statute is not

12 one of those procedural steps, it's not one of those procedural

13 rules that allows a -- or presents to the Court some procedural

14 mechanism for a class action or representative actions.

15         What they've said in their briefs is you could take

16 any kind of cause of action, and if that cause of action can be

17 brought in court as a class action, then somehow it makes that

18 cause of action a class action.  Under their theory, a contract

19 cause of action or any statutory cause of action that you could

20 bring in court and then bring it under Rule 23 or some state

21 analogue to Rule 23 all of a sudden magically turns into a CAFA

22 class action.

23         That's not the way the Third Circuit interprets the

24 statute and that's not the way Daniel's Law should be

25 interpreted.  Daniel's Law is a very specific law.  It's not a

1  procedural device for bringing a class action.

2         One other thing that's been brought up in some of

3  these briefs is that we fraudulently joined --

4         THE COURT:  There's two cases, Atlas vs. MyHeritage

5  and I think Atlas vs. Thomson Reuters, the two cases that I

6  recall.

7         MR. SHAW:  Correct, that's my understanding.

8         THE COURT:  What about that?

9         MR. SHAW:  Your Honor, fraudulent joinder is slightly

10 different than the analysis you do under kind of collusive

11 jurisdiction.

12        THE COURT:  It's quite different, yeah.

13        MR. SHAW:  Yes, it's quite different.

14        And I think there the standard is you're not supposed

15 to look to the merits of the case.

16        THE COURT:  Right.  But are the defendants looking to

17 the merits?  They have affidavits or declarations saying that

18 these parties had nothing to do with the removal of names or

19 the collection of names.  And there's no evidence to the

20 contrary, is there?

21        So, in other words, you're right, it's not a 12(b)(6)

22 analysis.  I have to determine whether it's a colorable claim

23 and whether it's totally -- I think the Court of Appeals in

24 *Batoff* says totally insubstantial and frivolous.

25        So what about that?  You had opportunity for

```
 1   discovery, didn't you, on this issue?
 2           MR. SHAW:  No, Your Honor, we did not engage in any
 3   discovery or --
 4           THE COURT:  You may not have, but you had the
 5   opportunity to.
 6           MR. SHAW:  Arguably.  But in any event, I do think you
 7   articulated the standard correctly, whether essentially our
 8   complaint, which has to be taken as true, and you have to
 9   evaluate whether it states some claim against the non-diverse
10   defendants and whether it's frivolous.
11           And we would say it's not frivolous and it does state
12   a claim.  And we think -- you know, where the kind of issue is
13   joined on that part of the motion is it's true that they're
14   saying they had no involvement in it, but our complaint is
15   saying they did.  Our complaint lists very clearly a claim
16   against these defendants.  We've articulated --
17           THE COURT:  Well, what if you had said the governor
18   of Pennsylvania had something to do with it?  Could the
19   governor file an affidavit saying I had nothing to do with
20   Daniel's Law?  And then would I have to allow that case to go
21   forward?
22           MR. SHAW:  Maybe not in that situation but --
23           THE COURT:  Why not?
24           MR. SHAW:  Because here what we've said is -- we
25   haven't just named some party and not have any factual
```

1    allegations against them.  But we've named a party and made

2    specific factual allegations against them that are based on our

3    investigation of the facts and our presentation of the facts,

4    that those parties -- by the way, we go to -- the way those

5    parties are in this case is because we went to a website, the

6    website listed an address to contact for purposes of dealing

7    with data privacy and taking down information, and then

8    directly under it on the website, directly there it says those

9    Thomson Reuters parties are the corporations that are

10   presenting these addresses.  That's one part of it.

11          The second part of it is they're trying to say we had

12   nothing to do with it -- they're not saying we had nothing to

13   do with it writ large, they're saying we didn't do the things

14   that Daniel's Law prohibits.  And in Daniel's Law there's verbs

15   basically that say if you do these things --

16          THE COURT:  Right.

17          MR. SHAW:  -- you could be responsible.

18          And they're trying to take a very narrow

19   interpretation of those verbs.  And we're saying they did those

20   things.  Thomson Reuters did those things.  And that's in

21   our -- that's in our complaint.

22          And if Your Honor relies on their affidavits, then

23   you're looking at the merits.

24          THE COURT:  You're saying the complaint is

25   sufficiently specific to make allegations?

```
 1            MR. SHAW:  Correct.  And it's not --

 2            THE COURT:  And it ties them to Daniel's Law and the

 3    violations of Daniel's Law.  And that simply because the

 4    defendant has provided an affidavit, that's just raising an

 5    issue which will have to be decided at a later time?

 6            MR. SHAW:  Correct, Your Honor.  That's my outline, if

 7    I understand, they'll be making arguments on.

 8            THE COURT:  Those who are opposing you?  Mr. Stio?

 9            MR. STIO:  Good morning, Your Honor.

10            THE COURT:  Good morning.

11            MR. STIO:  Your Honor, Angelo Stio from Troutman

12    Pepper Hamilton Sanders.  I'll be arguing and addressing the

13    federal diversity jurisdiction argument for the 37 cases, or

14    defendants that are subject to a motion for remand with respect

15    to diversity jurisdiction.

16            I have my colleagues here, David Cheifetz from Hogan

17    Lovells, and he's going to address the CAFA mass action, a

18    jurisdictional basis that this Court has; and my colleague,

19    Sarah Hutchins from Parker Poe, who will address the CAFA class

20    action.

21            In addition, Marcel Pratt, although he's not sitting

22    at counsel table because there's not enough chairs, he's with

23    Ballard Spahr, he represents Thomson Reuters and he will

24    address the fraudulent joinder.

25            THE COURT:  Thank you.
```

1          MR. STIO:  So on diversity joinder, I think Your Honor

2     has it right, the issue before the Court is whether Atlas is a

3     real party in interest for purposes of diversity of

4     citizenship.  There is no dispute here about the amount in

5     controversy with regard to diversity.

6          And, Your Honor, we've outlined in our brief that the

7     Court has diversity jurisdiction here because Atlas is not a

8     real party in interest and, therefore, under the federal case

9     law, including *Grassi* and *Attorneys Trust*, its citizenship can

10    be disregarded.

11         And I say this, Your Honor, because there's a long

12    line of cases that say when there is an assignment or a

13    transaction that has the practical effect of preventing

14    jurisdiction, federal courts look at the totality of

15    circumstances.  And I believe Mr. Shaw does not dispute that.

16    It's a factual inquiry.  Your Honor said that.

17         And they also can look at the substance of the

18    underlying transaction to make what *Attorneys Trust* said

19    is an --

20         THE COURT:  How is this different from the *Sprint* case

21    in the Supreme Court which said that assignees have standing,

22    which is, I think, for present purposes it's the same as being

23    a real party in interest?  And their payphone operators assign

24    their small claims to what was called an aggregator as the

25    assignee, and the Supreme Court said you look to, in effect,

1  the citizenship of the assignee?

2       Isn't that what we have here?  We have a lot of small

3  claims being assigned to Atlas because the -- it's impractical

4  for all these little payphone operators or for the policemen in

5  Camden and Newark to bring an action.  So you aggregate them

6  and you make an assignment.  And the assignment on its face

7  here appears to be a full assignment, as was the case in the

8  *Sprint* case.

9       Why isn't this any different in terms of the first

10 step we have to go through in terms of 1338 jurisdiction?

11      MR. STIO:  Okay.  So it's different for a number of

12 reasons.  One, and I think you pointed it out, *Sprint* did not

13 involve a motion for remand.  *Sprint* is a standing case, not is

14 there a real party in interest for purposes of determining

15 diversity.  *Sprint* was actually filed in federal court.

16      THE COURT:  It was.

17      MR. STIO:  And assignments have been around for over

18 100 years.  It doesn't matter whether the assignment is valid

19 under state law, it doesn't matter under common law.

20      When you look at the totality of circumstances, who is

21 the real party in interest?  In *Sprint*, the argument wasn't

22 you, *Sprint* -- or you, aggregator attorney law firm, are not

23 being here for purposes of destroying diversity.  The question

24 was, did they have Article III standing?  And the Supreme Court

25 there focused entirely on Article III standing and said they

```
 1    do.

 2            Here, you have -- when you look at the factors under

 3    Grassi, under Attorneys Trust, you have evidence that when the

 4    totality of circumstances are considered --

 5            THE COURT:  But aren't you conflating the two?  First

 6    we have to decide whether it's a real party in interest.  And

 7    even if it is a real party in interest, you still have to go to

 8    the second step, which is determining whether the assignments

 9    were for purposes of manufacturing diversity jurisdiction.

10            So I think it's a two-step process.  Because even in

11    the Sprint case, at the very end of the opinion, the Supreme

12    Court said this is not a case where anybody's claiming the

13    assignments were in bad faith.  So they recognize that even if,

14    in Sprint, that the assignee had standing or a real party in

15    interest, the result might have been different if these

16    assignments were not made in good faith, which gets into the

17    collusion issue.

18            MR. STIO:  Your Honor, I want to touch on that.

19            THE COURT:  You think we should conflate these two

20    steps?

21            MR. STIO:  I don't think that there's two steps, and

22    let me tell you why.

23            THE COURT:  Okay.

24            MR. STIO:  Your Honor, Grassi and Attorneys Trust have

25    said you look at the totality of circumstances to determine who
```

1    is the real party in interest.  And when you say, well, we have

2    to look at that second step of did they do this to conflate or

3    get into federal court, prevent federal court, that's motive.

4    Right?  That's not a separate step.  And -- if we could put up

5    Slide Number 1.

6         *Attorneys Trust* said the motive for an assignment is

7    not a controlling factor.  And the court put two steps there.

8    This is in *Attorneys Trust* on page 956.  Ninth Circuit Court of

9    Appeals.  They say, when they're going through diversity

10   jurisdiction:  There's no reason to give motive controlling

11   weight in every case, although it will surely illuminate an

12   otherwise hidden improper motive and may be virtually

13   controlling in some cases.  The objective fact of who really is

14   the party in interest is the most important thing to be

15   determined.

16        Okay.  So in *Attorneys Trust* they say motive is not a

17   separate analysis, it's part of the factors the court

18   considers.

19        THE COURT:  Isn't this basically an issue of fact?

20   Why are they -- I mean, what device do they use to come in

21   to -- do they manufacture jurisdiction?  Isn't that really the

22   issue?

23        MR. STIO:  The issue is, are they defeating foreign

24   defendants' rights to be in federal court?  And there is a

25   framework of factors that the Court can consider.  And to say

1  that is it collusion, is it scam, is it fraudulent -- because

2  that's what they want the Court to do, but that's not the test.

3  The test is who's a real party in interest, what's the real

4  substance of the underlying transaction?

5         And when you look at the size of the interest that

6  goes back to the assignors or the purported covered persons,

7  65 percent, a hundred percent of the relief with regard to

8  injunctive relief is for the covered persons.

9         THE COURT:  Right.

10        MR. STIO:  So let's take a hypothetical.  If they came

11 in in the *Sprint* case and said we're going to have injunctive

12 relief, a hundred percent of that relief belongs to the covered

13 person.

14        And I would suggest to the Court, under *Attorneys*

15 *Trust,* you can't have an entity for the --

16        THE COURT:  But it was a total assignment, wasn't it?

17        MR. STIO:  In *Sprint* it was --

18        THE COURT:  It was every dime that was due to the

19 payphone operators would go to the assignee.  And then there

20 was a separate agreement apparently that if the aggregator, the

21 assignee, won the case, then the money would be turned over to

22 the assignors for a fee, I think is the way that the court

23 describes it.  I don't know who was paying the counsel fees,

24 but in any event -- and then the Supreme Court said it didn't

25 matter what the assignee did with the money.  In other words,

1  they could have given it to charity.  So the court's not

2  concerned about that.

3       So once Atlas is the assignee, whether they take the

4  money and take it to Atlantic City to the casino or whether

5  they give it to a charity or what they do -- I mean, isn't that

6  what the Supreme Court said?  I mean, Justice Breyer was

7  talking about that, it didn't matter.  The dissent had a

8  different view, I understand.

9       MR. STIO:  But they said it in the context of

10  standing, a cognizable injury.  If that were the case,

11  *Attorneys Trust*, the 12 percent that went to the assignee, that

12  was found improper because they applied the factors.

13       In *Grassi*, the two percent that went to the assignee,

14  that was improper because they went through the factors.

15       And there's numerous cases in our briefing that talks

16  about these percentages.  You have *Attorneys Trust*, you have

17  *Airlines Reporting vs. S&N Travel*, you have *Harrell vs. Sumner*

18  *Contracting* where 50 percent went back to the assignee.  All of

19  these were found to be improper for purposes of diversity.  Not

20  standing, but purposes of diversity.

21       And all we're saying is you can disregard Atlas's

22  citizenship when you look through the factors.  One, there is a

23  substantial interest that these individual assignees retain.

24  65 percent of any recovery, 100 percent of injunctive relief.

25       THE COURT:  But the real question is -- the Court has

```
 1   to figure out, what is really going on here?  I mean --
 2           MR. STIO:  Correct.
 3           THE COURT:  These steps in Grassi and Attorneys Trust
 4   are just tools for the Court to use to find out what is really
 5   going on here.  Is the purpose either to get into federal court
 6   or to stay out of federal court in a collusive manner?
 7           So that's what -- it's really a factual question.  And
 8   I have to look at the totality of the circumstances.
 9           MR. STIO:  Agree with that.
10           THE COURT:  Now, do you really think any member of the
11   New Jersey Assembly or the New Jersey Senate was thinking about
12   diversity jurisdiction when they passed Daniel's Law?
13           MR. STIO:  Absolutely not.  But that's not a
14   consideration.
15           THE COURT:  Okay.  Now, do you think any police
16   officer in the state of New Jersey or any prosecutor, when an
17   assignment was made to Atlas, was thinking about diversity
18   jurisdiction, that the purpose of the assignment was either to
19   get in to federal court or to stay out of federal court?  Do
20   you think any of those people were thinking about that as a
21   motive or as a purpose?
22           MR. STIO:  I think so, Your Honor.  Again, motive is
23   not controlling.  But I do think that that one is wrong.
24           THE COURT:  So you -- what evidence is there that that
25   was happening?
```

```
 1              The officer on the beat doesn't want his home address
 2    and unlisted phone advertised or disseminated, that he was
 3    sitting back and saying, yeah, I'm going to assign this to
 4    Atlas because I either want to be in federal court or I don't
 5    want to be in -- I'd rather be in the Superior Court of Hudson
 6    County rather than in the federal court.
 7              MR. STIO:  So, Your Honor, that -- A, I would ask the
 8    Court to take a look at the Supreme Court decision in Kramer
 9    and the Long John Silver's case that say it doesn't matter if
10    an assignment is valid under state law.  So I'll start with
11    that --
12              THE COURT:  I agree with that.
13              MR. STIO:  Federal question.
14              THE COURT:  You're not questioning the validity of the
15    assignment.
16              MR. STIO:  Yes.
17              Two, you ask if any police officer or judge sat around
18    saying, do I think that their assignment is going to create a
19    diversity jurisdiction?
20              THE COURT:  Or not.  One or the other.
21              MR. STIO:  So what I would point Your Honor to are the
22    factors.  And one of the factors here is prior interest in the
23    assigned claim.
24              THE COURT:  Right.
25              MR. STIO:  Atlas has zero interest in the assigned
```

1    claim.

2         Second factor is, did they actually pay for the

3    assignment?  Did they give consideration?  Atlas did not give

4    any consideration for the assignment here.  And the reason why

5    is Atlas created a system where they have two products.  Right?

6    They have the platform services and then they have what they

7    call enforcement action brought on behalf of Atlas.

8         THE COURT:  Right.  Okay.

9         MR. STIO:  They're contained in terms of service or

10   service terms.  It's not a contract, it's a boilerplate

11   document that's on a website that all of these police officers

12   are told by the union bosses sign up for.

13        THE COURT:  Well, there's certainly -- see, it's not a

14   -- there's certainly reliance, isn't there?  Wouldn't there be

15   principles of estoppel and --

16        MR. STIO:  Well, it's a negotiated contract, Your

17   Honor.

18        THE COURT:  Well, you're saying it's a contract of

19   adhesion, is that what you're saying it is?

20        MR. STIO:  It's in our brief.  Yeah.

21        THE COURT:  Yes.  But what -- and you say that's

22   relevant to --

23        MR. STIO:  If the assignment is invalid, it's

24   absolutely relevant.  Even if the Court --

25        THE COURT:  So you're claiming that the assignment is

```
 1   invalid now under state law?
 2          MR. STIO:  If the assignment isn't valid, what right
 3   do they have to bring a claim?
 4          THE COURT:  You're saying it is invalid?
 5          MR. STIO:  If it is.
 6          THE COURT:  No.  What is your position, it is or isn't
 7   it?
 8          MR. STIO:  We weren't allowed to take discovery on
 9   that.
10          THE COURT:  All right.
11          MR. STIO:  But I can tell you that when you look at
12   the service terms -- it's on a website, it's a click of a
13   button and it's non-negotiable.  And the parties are not in
14   equal bargaining power, right?  You have members of a union who
15   are being told by the union chiefs, sign up for this.  And you
16   saw that, Pat Colligan's notice back in 2023.  Hey, sign up for
17   this.  There was no choice.
18          So to ask would they intend that, no.
19          THE COURT:  Well, there certainly was a choice.  They
20   didn't have to sign up for it.
21          MR. STIO:  Well, they didn't have to.  But --
22          THE COURT:  And they could have -- I mean, we do have
23   six or eight individual plaintiffs in this case as well as
24   Atlas.
25          MR. STIO:  We do.  And those six -- let me go through
```

1   those six individual plaintiffs.

2          THE COURT:  We have two John Does and I think six

3   named plaintiffs.

4          MR. STIO:  There's three named ones, right?  There's

5   Patrick Colligan, who is past president of the PBA.  He is in,

6   I think, 65 of the cases in federal court.

7          There's William Sullivan, who is the president of the

8   Local 105, which is the correction officer's union.  He is a

9   named plaintiff in 59 of these cases.

10          And then there's Peter -- and I'm going to butcher his

11   name -- Andreyev, who is the current president of the PBA, and

12   he's in 75 of these cases.

13          Now, I would submit to the Court that the reason why

14   the union leadership is in these cases is because they're

15   involved in strategy and decision.  They have to be.  They're a

16   party to the case.  But they're union members, there's

17   allegiors.  They represent the constituents with all these

18   covered persons.

19          And that's why I hesitated, Your Honor, when you said,

20   well, do you think a police officer sits around?  No, I don't

21   think the police officers knew anything about what was going

22   on.  They were told to sign up.

23          Do I think that Atlas and the unions had something

24   involved in how do we maximize recovery, how do we make it

25   difficult for these companies?  Absolutely.

1          THE COURT:  Well, that's a different question as to

2     whether there's diversity jurisdiction.

3          MR. STIO:  No, it goes to diversity jurisdiction

4     because there's, A, the interest here substantially and the

5     relief goes to the covered people.

6          Two, Atlas didn't pay anything for the assignments.

7     Zero.

8          Three, the assignments here occurred either the day

9     before all these complaints were filed -- another relevant

10    factor in *Attorneys Trust* -- or after the complaints were

11    filed.

12         THE COURT:  But they did have a relationship

13    previously.  In other words, maybe the assignment wasn't

14    formalized, but they had had discussions, had they not, with

15    the unions and so forth?

16         MR. STIO:  They have contracts with the union.

17         THE COURT:  Yes.  So that goes back beyond the day

18    before the complaints were filed.

19         MR. STIO:  No.  But did they have a interest in the

20    claim?  And they didn't.  Because the claim doesn't exist until

21    there's an alleged violation of the law.  And Atlas doesn't

22    have a right to claim until they send out that confirmation.

23         THE COURT:  Ten days to expire, right.

24         MR. STIO:  Right.  They did it the day before they

25    filed suit.  *Attorneys Trust*, directly on point, says if it's

1  around the time close to when suit is filed and if there's no

2  consideration, that's indicative of not the real party in

3  interest here.

4          THE COURT:  Indicative or controlled?

5          MR. STIO:  No factor is controlling.  But it does show

6  the hallmarks of attempts to get into federal court or defeat

7  someone from getting into federal court.

8          And I want to say that *Attorneys Trust* and *Grassi*

9  didn't -- the judge didn't just say I like these factors, I'm

10  going to use it.  When you read the opinions, the judge

11  surveyed what was happening in federal courts.  And they have

12  adapted the law recognizing the different tactics that parties

13  use to either get into federal court or defeat federal court.

14  There's no statute as to defeating federal court.  But

15  *Attorneys Trust* --

16          THE COURT:  But there are analogous cases which

17  say that -- right, 1359 goes one way, but I think there's a

18  large body of law which says you also figure out why people

19  want to avoid federal court.

20          MR. STIO:  Correct.  And they developed a frame --

21          THE COURT:  Yes.  It's analogous to what 1359 says.

22          MR. STIO:  And so -- and let me take it another step

23  back.

24          When we talk about motive, motive, motive, those

25  motive decisions came out because parties said, yeah, we added

```
 1  Angelo Stio to the complaint because Angelo's from Delaware and
 2  we want it to be in federal court.
 3           And the courts traditionally didn't look at motive.
 4  In fact, there's a Third Circuit case and a Supreme Court
 5  case -- the Third Circuit case is Mecon vs. Fitzsimmons, 284
 6  U.S. 183 (1931), where it involved the appointment --
 7           THE COURT:  What's the name of the case again?
 8           MR. STIO:  Mecon, M-E-C-O-N.  Mecon vs. Fitzsimmons.
 9           THE COURT:  Okay.
10           MR. STIO:  And it involved the appointment of an
11  administrator.  And the court said we're not getting into
12  motive, motive isn't important here.
13           And then there's the Jaffe case from the Third
14  Circuit, they said the same thing, albeit in a different
15  context -- right? -- appointment of a fiduciary duty or
16  appointment of a guardian.  But they said, no, motive doesn't
17  even come into play here, and they looked at other factors.  If
18  you look at even --
19           THE COURT:  How about the McSparran case in the Court
20  of Appeals?
21           MR. STIO:  Say it again?
22           THE COURT:  The McSparran case.
23           MR. STIO:  I am sorry, I can't hear you.
24           THE COURT:  The McSparran case.
25           MR. STIO:  Yes, there's a McSparran case where they
```

1  discuss that.  And they even said -- they drew a distinction

2  about a motive in that case and even drew a distinction between

3  the analysis under --

4         THE COURT:  It involved a situation where a lawyer in

5  Philadelphia would appoint his secretary from New Jersey as the

6  administrator or guardian --

7         MR. STIO:  Correct.

8         THE COURT:  -- in order to get into the Eastern

9  District of Pennsylvania to avoid, in those days, the Common

10 Pleas Court.

11        MR. STIO:  Correct, yeah.

12        THE COURT:  And there are a lot of cases --

13        (Simultaneous speakers.)

14        MR. STIO:  And the *McSparran* case actually cites to

15 *Jaffe* and *Mecon*.

16        But, Your Honor, there's other factors here too.  The

17 other factors include prior interest in the case, in the claim.

18 And Atlas has said, well, we have a prior interest in the claim

19 because we have this platform.

20        Atlas has two products, and their website advertises

21 it as two products.  If you look -- Slide 2, Stephanie.  This

22 is from Exhibit 12 to my declaration.  The two products under

23 paragraph 5, there's subscription fee services and then there's

24 outcome-base service fees that are computed as a percentage of

25 any damage awards or settlement.

1          They're in two buckets.  Right?  Subscription fee

2     services are the platform.  Emails, sign-up.  The unions pay

3     for that.  The record before the Court here is that the unions

4     pay the per-person fee there.  That's Exhibit 4, 5, and 6 to my

5     declaration.

6          The second bucket is these outcome-based service fees.

7     Unions don't pay for that, covered people don't pay for that.

8     That is something that is on a contingency fee basis for the

9     sole purpose of collecting liquidated damages.  And when a

10     party engages in a transaction to bring in another party to act

11     as just a conduit for a remedy, not for purposes of standing,

12     but for purposes of diversity jurisdiction, courts look at the

13     substance of the transaction.

14          And I would submit to the Court that if you look at

15     lack of consideration for the assignment; the timing when the

16     assignments occurred, was it a day of the complaint; who is the

17     real party in interest or substantial interest, the covered

18     people, it is not the type of case where you can sit back and

19     say Atlas is here because they had a prior interest in the

20     case.  Atlas is here --

21          THE COURT:  I understand.

22          MR. STIO:  -- to get a substantial recovery.

23          The other thing that's important is Atlas has said,

24     well, we pay all of our legal -- we pay all of our legal fees

25     and we make strategic decisions, therefore, we're the real

1  party in interest.  That's not correct.

2        And I'll show the Court, their corporate designee

3  testified at his deposition that these lawsuits are being

4  handled on a contingency fee basis.  And if you go to my

5  declaration, Exhibit 1, page 92.

6        Your Honor, he was asked:  Who is paying the legal

7  fees?

8        And Mr. Atkins said the following:  My understanding

9  of the flow of legal fees is that some of the fees might be

10  paid by Atlas, other fees would -- and I'm not a lawyer here so

11  I'm speaking to it as a layperson.  Other legal fees would be

12  included in a contingency-type arrangement where if there were

13  successful financial recovery in the case.

14        They're acting for a contingency fee basis.  And when

15  I asked were fees being paid for the enforcement action, if you

16  look at page 93, line 6, his response is:  Not with respect to

17  any losses that have currently been filed.

18        MR. PARIKH:  Mr. Stio -- Your Honor, I just want to

19  make sure, Mr. Stio -- some of these things are filed under

20  seal.  We're in open court, there's a transcript.  I just want

21  to make sure that Mr. Stio is aware of that.

22        THE COURT:  That's okay.  We can't hide this forever.

23        MR. PARIKH:  No, I understand.  I just wanted to raise

24  that.

25        THE COURT:  I don't know if it's fine, Mr. Stio, or

1  not, but go ahead.

2          MR. STIO:  So, A, their witness testified that they're

3  not paying legal fees here.  So the statement in their reply

4  brief that legal fees are being paid by Atlas for these

5  litigations, according to their own corporate designee, is

6  false.

7          Second, if you look at the service terms -- and

8  Stephanie, if you go to Slide 3.

9          The service terms make clear that the parties on the

10 hook for attorney's fees here are the assignors, the covered

11 persons.

12         Under Section 4(E)(ii), they talk about settlements

13 and they talk about recoveries.  It makes clear that the

14 covered persons get the net amount of any settlement received,

15 and that is -- net amount means:  Deducts it from amounts

16 actually collected less third-party attorney's fees and

17 associated investigation, litigation and collection costs and

18 expenses.

19         THE COURT:  That's not going to leave much for the

20 plaintiff, a thousand dollars.

21         MR. STIO:  But it goes to -- another factor, though,

22 is that it goes to the issue of who's paying the legal fees,

23 who's involved in the strategy.  And I would submit to the

24 Court the covered people are on the hook for these legal fees,

25 no risk for Atlas.

1          Two, strategy.  I mentioned it.  Three union heads are

2     named plaintiffs.  And we asked them, how did you determine the

3     named plaintiffs in these cases?  Their response was, it's

4     attorney-client privilege.

5          So, you know, what they can't do is give us the stiff

6     arm to discuss how did these three individuals become named

7     plaintiffs, and then come into court and say, well, there's no

8     bad motive here, everything is attorney-client privilege.  They

9     can't.  And they can't --

10          THE COURT:  It's not going to be relevant what the

11     named plaintiffs do because there's no assignment.

12          MR. STIO:  There is no assignment as to named

13     plaintiffs but --

14          THE COURT:  Yeah, so I don't know --

15          MR. STIO:  -- there was a conscious decision made as

16     to strategy.  How do we get --

17          THE COURT:  Mr. Stio, you've been a lawyer a long

18     time.  There's always strategy, isn't there, as to who's going

19     to be a party to a case and --

20          MR. STIO:  Absolutely.

21          THE COURT:  I mean, that was the whole idea of Rosa

22     Parks being the plaintiff in the early civil rights case.  Boy,

23     there was strategy to pick her as opposed to somebody else.

24     There's nothing wrong with that.

25          MR. STIO:  Well, if you do it so that you can deny an

1  out-of-state party access to federal court, there is something

2  wrong with it with regard to diversity jurisdiction, Your

3  Honor.  Not standing, but diversity jurisdiction.

4          Your Honor, the other issue that I just want to touch

5  on is prejudice.  Your Honor, another factor under *Attorneys*

6  *Trust* and *Grassi* is prejudice.  Is there -- when all of these

7  factors are layered on and you look at the real party  in

8  interest, what is the substance of this transaction?  Was it

9  made improperly because the party that is named here for

10  purposes of diversity isn't the real party in interest?

11          You know, federal courts and federal jurisdiction

12  exists to allow defendants, out-of-state defendants, to be in

13  federal court and not be subject -- and I'll say this

14  pejoratively -- are hometowned by local courts and local

15  politics.

16          These out-of-state defendants had went to the Third

17  Circuit and had a judge from Pennsylvania, who was not subject

18  to this law, and we did it because an appearance of

19  impropriety.  There's a lot of prejudice here if we don't look

20  at all the factors and these defendants now have to go back

21  into state court.  We don't think that Atlas is the real party

22  in interest.

23          And that's my presentation, Your Honor.  Thank

24  you.

25          THE COURT:  Thank you.

1          Who wants to go next?  Good morning.

2          MR. CHEIFETZ:  Good morning, Your Honor.  Give me one

3    second to set up.

4          THE COURT:  Please state your name for the record.

5          MR. CHEIFETZ:  Sure.  David Cheifetz from Hogan

6    Lovells.  I represent the defendants in the Lifetime Value

7    Company case.  And as Mr. Stio explained, I'll be explaining

8    the CAFA mass action argument on behalf of all of the

9    defendants.

10          THE COURT:  Thank you.

11          MR. CHEIFETZ:  As Your Honor identified before, this

12   is a separate and independent basis for removal that the

13   defendants have asserted here in many of the cases.  There's a

14   lot to unpack, but let me start with a simple and undisputed

15   observation about all of the removed actions here.

16          Each of the actions were filed by Atlas to aggregate

17   and prosecute the alleged monetary relief claims of thousands

18   and thousands of identified covered persons under a common

19   statute and in a single lawsuit.  It's somewhat remarkable, I

20   would submit, that these actions would be suggested to be

21   anything other than mass actions because they're, of course,

22   large collective actions that propose to join together the

23   claims of many more than a hundred different persons by using

24   mass assignments.

25          Now, Atlas says that it discovered a loophole, a new

1  CAFA loophole, and that actions that they bring by way of mass

2  assignments are not actually mass actions at all, and that they

3  escape federal jurisdiction simply because Atlas chose to list

4  only itself and a handful of other individuals in the captions

5  to the complaints here.

6       THE COURT:  Isn't that what the Supreme Court says in

7  *Hood*, there has to be a hundred named plaintiffs?  And there

8  are a hundred named plaintiffs.

9       MR. CHEIFETZ:  Absolutely.  I'm certainly not blind

10  to the language of *Hood*.  And as we would submit, *Hood* is

11  entirely --

12       THE COURT:  That's really the issue, isn't it?

13       MR. CHEIFETZ:  It is.  And of course, that's the

14  support Atlas relies on to effectively say there should be a

15  new loophole to CAFA's mass action provision.  *Hood* --

16       THE COURT:  It's not a loophole if the Supreme Court

17  says that's what the statute means.

18       MR. CHEIFETZ:  That's fair, Your Honor, but *Hood* had

19  nothing to do with mass assignments.  It had nothing to do with

20  mass assignments.

21       THE COURT:  Okay.  But the Supreme Court doesn't limit

22  it to that.  It says they're reading the statute -- regardless

23  of what the underlying claim is, there have got to be a hundred

24  plaintiffs, and there were a hundred.

25       MR. CHEIFETZ:  Understood.  Absolutely, Your Honor.

1  But just because the Supreme Court didn't use the magic words

2  that its holding was limited to the parens patriae context in

3  which it was decided doesn't somehow make the entire context

4  and reasoning of *Hood* somehow irrelevant.

5         THE COURT:  So what I would have to decide then is

6  whether or not the Supreme Court meant a hundred named

7  plaintiffs with respect to any mass tort action or whether it's

8  limited to parens patriae cases?  So that's going to be the

9  issue, right?

10        MR. CHEIFETZ:  That's correct, Your Honor.  I think

11 that's fair.  And I think for many, many reasons the Court can

12 conclude that.

13        I would say that *Hood,* ironically enough, recognized

14 that the very purpose of the CAFA mass action provision was to

15 "function largely as a backstop to ensure that CAFA's relaxed

16 jurisdictional rules could not be evaded."

17        And nothing about *Hood* -- and we could get into this

18 for sure -- requires this Court to adopt what I'm terming a new

19 loophole, because *Hood* didn't address the assignment issue at

20 all.

21        Atlas is suggesting that mass assignments allow it to

22 avoid mass action jurisdiction, and nothing about *Hood* would

23 allow Atlas to evade --

24        THE COURT:  Well, I understand.  But the issue is

25 regardless of what happened, you still need a hundred

1   plaintiffs, according to their argument.  And the one reading

2   of *Hood* would say you need a hundred plaintiffs, regardless of

3   whether there are assignments, whether there weren't

4   assignments, regardless of what the underlying claims are.

5           MR. CHEIFETZ:  That's true.  And I want to talk about

6   what -- we can turn to *Hood,* but I do think it's -- and I'm

7   going to turn to *Hood*, I promise, but I do think it's important

8   to acknowledge at the outset that -- let's put aside *Hood* for

9   just a moment because it's important.

10          Nobody disputes here these would otherwise be mass

11  actions.  And as the Third Circuit has recognized -- let's

12  assume *Hood* is inapposite, let's assume I convince Your Honor

13  *Hood* is inapplicable.

14          Under Third Circuit controlling law, mass actions are

15  basically "collective actions that utilize large scale joinder

16  or other consolidation mechanisms to aggregate claims."

17  That's what the *Robert D. Mabe* case holds in the Third

18  Circuit.  That's exactly what these actions are.  Atlas has

19  conceded --

20          THE COURT:  Is that before *Hood* or after?

21          MR. CHEIFETZ:  After.  And Atlas has conceded as

22  much.

23          The whole purpose of the mass assignment here,

24  according to Atlas, was so that it could collectively prosecute

25  and aggregate thousands of covered persons' claims in one

 1  action against each defendant group.

 2       We've heard a lot about *Sprint*.  *Sprint*'s important.

 3  They cite *Sprint*, they rely on *Sprint*.  But if Your Honor

 4  looked at page 291 of *Sprint*, you'll see that in *Sprint* the

 5  court explained that a mass assignee, or as the Supreme Court

 6  termed it an aggregator, is "one of several methods for

 7  bringing about aggregation of claims; i.e., they are but one of

 8  several methods by which multiple similarly-situated parties

 9  get similar claims resolved at one time and in one federal

10  forum."

11       And not only that, the Supreme Court specifically

12  analogized a mass assignee like Atlas, or an aggregator, to

13  Federal Rule of Civil Procedure Rule 20(a), which allows

14  multi-party joinder.

15       So the critical point I want to make is under the

16  Supreme Court's own analysis in *Sprint* and, frankly, common

17  sense along with the Third Circuit's analysis, litigation by

18  mass assignment is just mass joinder by a different case.  It

19  involves claims of many different people who want their claims

20  heard together in a single lawsuit.  And that's precisely the

21  kind of collective action that the Third Circuit tells us is a

22  mass action.

23       THE COURT:  But whose claims are they?  Once the

24  assignment is made, it's the claim of the assignee, isn't it?

25  It's one person that has a lot of claims.

 1          MR. CHEIFETZ:  We disagree with that, Your Honor, here

 2     in particular, because of the factors Mr. Stio identified where

 3     the covered persons retained the lion's share of the legal and

 4     financial interest here.  We don't believe it's so simple to

 5     say that the only claims here belong to Atlas.

 6          It might be different, as Your Honor observed at the

 7     last hearing, if Atlas had paid monetary consideration upfront

 8     for the assignment, the covered persons took whatever they were

 9     agreeable to and then let Atlas pursue recovery of Atlas's own

10     claim.  That's not what happened here at all.

11          There was no outright giving of the claim from the

12     covered person to Atlas for money.  The covered person said

13     we're going to retain most of the interest here, you go and try

14     to collect for us, and in that sense Atlas is very much an

15     assignee for collection purposes, as many different cases have

16     explained that.

17          And I want to turn to *Hood* because, obviously, *Hood* is

18     important here.  Context matters.  And we don't think *Hood*

19     applies to these very different facts and I want to explain

20     why.

21          First of all, it matters in many different ways here.

22     *Hood* was actually part of a series of CAFA decisions by the

23     Supreme Court in a short period of time.  Less than ten months

24     prior to *Hood,* in Standard Oil(Sic) vs. *Knowles*, the Supreme

25     Court accepted CAFA mass action jurisdiction and rejected an

1  argument that it said would have elevated forum over substance.

2  That was just ten months prior to *Hood*.

3         Ten months after *Hood,* the Supreme Court in *Dart*

4  *Cherokee* emphasized that CAFA's removal provisions should be

5  read broadly with a strong preference for federal jurisdiction

6  and no presumption against removal.  And that was to effectuate

7  congressional intent to broaden federal jurisdiction in certain

8  cases.

9         THE COURT:  Did either of those cases talk about the

10  hundred plaintiff --

11         MR. CHEIFETZ:  No, they don't, but it's context.

12         More importantly, the specific parens patriae context

13  here makes all the difference.  The specific question presented

14  in *Hood* highlights this point.

15         The court said on page 164 of the *Hood* decision:  The

16  question presented is whether a suit filed by a state as the

17  sole plaintiff constitutes a mass action where it includes a

18  claim for restitution based on injuries suffered by the state

19  citizens.  We hold that it does not because the state of

20  Mississippi is the only named plaintiff.

21         Later on, on page 173 to 174, the court said:  If

22  Congress had wanted representative actions brought by states as

23  sole plaintiffs to be removable under CAFA, it would have done

24  so in the class action provision, not mass action.

25         That further demonstrates the narrow question

1    presented in *Hood*.

2         And why is this parens patriae context so important

3    here?  Because think about what a parens patriae suit is.  It's

4    a suit brought by a state in the state's own sovereign or

5    quasi-sovereign interest, as the Supreme Court has told us, on

6    behalf of the state.  It cannot bring the individual claims of

7    individual private citizens and stand in their shoes.

8         And here, of course, that's exactly what Atlas

9    professes to do.  It professes not to be a sovereign entity

10   like a state, it says it stands in the shoes of 19,000 known

11   people who have their own private claims who want them pursued

12   in litigation.

13        And it's not just that the assignments are different.

14   It makes it what Third Circuit courts have said is a

15   paradigmatic counter example to a parens patriae suit because

16   if a state, for example, were to proceed by way of assignment,

17   not parens patriae authority, or proceed as a collection agent,

18   the Supreme Court in *Alfred Snapp* has said:  In that context

19   the state would be no more than a nominal party asserting the

20   rights and claims of individual citizens.

21        And that's what the *Alfred Snapp* case said in the

22   Supreme Court, that's what the Third Circuit has said in the

23   *Harbour Portfolio Capital* case and --

24        THE COURT:  I understand what you're -- but doesn't

25   the *Hood* case say we don't look at the issue of real party in

```
1    interest.  It may be relevant for a lot of other purposes, even

2    in this case, but you don't look at who the real party in

3    interest is.

4           It goes on to say that when it begins to parse the

5    statute so --

6           MR. CHEIFETZ:  And that's not -- I am sorry, go

7    ahead.

8           THE COURT:  So you don't look at the real party in

9    interest here.  You look at what the statute says, and it talks

10   about, the Supreme Court's view, named plaintiffs, not whether

11   they're real parties in interest.

12          MR. CHEIFETZ:  That's right.  And that's not our

13   theory in this case.  I want to be clear about this.

14          Obviously, a real party in interest is relevant to the

15   collusive assignment argument that you just heard.

16          THE COURT:  Right.

17          MR. CHEIFETZ:  That is a theory advanced in *Hood* for

18   why there should have been CAFA jurisdiction.  That is not the

19   theory defendants advance here for CAFA mass action

20   jurisdiction.

21          It's very different.  Because in the parens patriae

22   context, the defendants' arguments in *Hood* was there are

23   millions of unknown, unnamed Mississippi citizens who have this

24   indirect interest in the state's claim.  It was a very

25   attenuated argument.  And the defendants there said you should
```

1    treat them as real parties in interest because of that

2    attenuated interest, they might benefit some way from the

3    states recovery.  That is not what we're arguing here.

4         THE COURT:  Well, the Supreme Court simply could have

5    said parens patriae cases, they're not mass torts, because it's

6    the sovereign state of Mississippi or quasi-sovereign state --

7    it's the state's claim, that's only one claim, even though they

8    mask it in terms of representing the people of the state.

9         MR. CHEIFETZ:  Right.

10        THE COURT:  They could have ended right there.

11        MR. CHEIFETZ:  They could have.

12        THE COURT:  And then they go on to talk about what the

13   wording of the statute is.

14        MR. CHEIFETZ:  They could have.  And I acknowledge,

15   they did not say that this holding is limited to the parens

16   patriae, I acknowledge that.  But they don't have to say that

17   to make the whole context -- the context still matters.

18        And think about this.  The Supreme Court has said --

19   and they have said this very clearly.  This is in the Franchise

20   Tax Board case, 463 U.S. 1, 21, note 22, that where a state

21   brings a lawsuit in its own state court, there are sovereignty

22   concerns and federalism concerns that make the court loathe to

23   allow removal of that action.

24        The court said in that case --

25        THE COURT:  In this case --

```
 1            MR. CHEIFETZ:  I know --
 2            THE COURT:  In Hood, Mississippi was the plaintiff.
 3   It wasn't the defendant being forced into federal court,
 4   correct?
 5            MR. CHEIFETZ:  No, that's not correct.  The state
 6   filed in state court and the case was removed.
 7            THE COURT:  Okay.  I'm incorrect on that.
 8            MR. CHEIFETZ:  And my point is, the Supreme Court is
 9   very protective of state --
10            THE COURT:  It didn't say anything about that in the
11   Hood opinion.
12            MR. CHEIFETZ:  I understand that.  Again, I'm giving
13   the Court important context for why I think the Supreme Court
14   was particularly concerned -- and we know that they were
15   because of the Franchise Tax Board case -- with state suits
16   brought in their own state courts.
17            Now, Your Honor mentions the reasoning and the
18   rationale of Hood, and again, we think that on the very
19   different facts it doesn't apply, but even if Hood applies
20   here, we believe it should be read narrowly and applied that
21   way.
22            Hood cannot mean just look at the names in the CAFA.
23   It's a gross over-simplification of Hood to say that.  It would
24   be -- I think we've heard the argument that -- and Hood even
25   said this, it's important to have simple jurisdictional rules
```

1  that courts can adhere to, but it shouldn't be so simple for

2  parties to be able to circumvent a federal jurisdictional

3  statute.

4        And remember, the intent of CAFA, the Supreme Court

5  told us, was to expand federal jurisdiction.  So we believe

6  that with respect to mass assignments, which are mass joinder

7  in name -- not in name, but in substance, as *Sprint* tells us,

8  would elevate form over substance in the way that *Knowles,* in

9  the Supreme Court case *Knowles* said ten months before *Hood,*

10  you shouldn't do in CAFA, it would undermine congressional

11  intent to broaden jurisdiction, contrary to what *Dart Cherokee*

12  said by the Supreme Court ten months later.

13        The reference to named plaintiffs here we,

14  respectfully, would submit should be understood more to

15  distinguish between the types of unidentified, unknown,

16  anonymous citizens in Mississippi and the known, identified

17  covered persons here.

18        There's a big, big difference between the two --

19        THE COURT:  But the Supreme Court could have easily

20  said that.  That's a very strange way to reach that result.

21        MR. CHEIFETZ:  I understand that.  But look at the

22  reasoning behind the ultimate holding in *Hood* and you can see

23  why it turns on that difference.  Again, *Hood* turns on the

24  difference between those unspecified, unnamed, attenuated real

25  parties in interest, Mississippi citizens which we're not

```
 1  talking about here, who have no claims of their own in Hood.
 2  They had no individual claims.
 3         And what the Supreme Court said was we didn't
 4  find --
 5         THE COURT:  If that was the point -- and I see what
 6  you're saying -- the Supreme Court could have said simply
 7  there's only one party here, can't be a mass tort.  The state
 8  of Mississippi is the only party here that we're talking about.
 9         MR. CHEIFETZ:  Well, that would be what the Supreme
10  Court said.  But I'm suggesting if you look and unpack the
11  actual reasoning behind the holding, you'll see that it turns
12  on this important point.
13         The issue with respect to needing to be a plaintiff,
14  not a person.  First of all, CAFA doesn't use the phrase "named
15  plaintiffs," so the idea that the Supreme Court was laying down
16  a rule that applies in all potential context, notwithstanding
17  what it said in Hood about mass assignment being akin to
18  multiple party joinder, to say that you have to simply count up
19  the people that the plaintiff names in the caption and elevate
20  all form over substance, there's nothing about Hood that
21  requires the Court to do that.
22         Now, I acknowledge the Supreme Court did say you
23  should read persons to mean plaintiffs, but look at what the
24  Supreme Court said about that.  It had to be understood as
25  plaintiffs who are pursuing claims in court.  And that's
```

1    exactly what the covered persons are doing here.  They should

2    be treated as plaintiffs.

3         And even if the Court were to apply *Hood*, we believe

4    that it should extend *Hood* to this mass assignment context.

5    The Court should just ask, are the covered persons fairly

6    considered plaintiffs here in the way that the Supreme Court

7    went through in *Hood*?

8         And the answer to that is yes for many, many reasons.

9    And I just want to, before covering that, just pause on that

10   for a second and look at the language in *Hood,* because Your

11   Honor is right to focus on it.

12        With respect to the requirement in *Hood* that you have

13   to identify plaintiffs, here's what the *Hood* court said on

14   page 169:  100 or more persons cannot be unspecified

15   individuals who have no actual participation in the suit, but

16   instead, the very plaintiffs referred to later, the parties

17   proposing to join their claims in a single trial.

18        It's parties who have their own claims proposing to

19   try them.  The unnamed Mississippi citizens in *Hood* had no

20   claims, they couldn't have been proposing to try anything.

21   Here it's completely different.

22        THE COURT:  Well, of course you -- the question

23   becomes after the assignment, do they have any claims?  Do the

24   19,000 people have any claims?

25        MR. CHEIFETZ:  Yes.  And that goes back -- and I'll

```
 1   explain why.
 2           First of all, that goes back -- first of all, I think
 3   it's undisputed that, unlike the Mississippi citizens, these
 4   covered persons allegedly have their own personal claims.
 5           THE COURT:  Not anymore after the assignment.
 6           MR. CHEIFETZ:  Before the assignment, at a minimum,
 7   that's undisputed.
 8           THE COURT:  Right.
 9           MR. CHEIFETZ:  In Hood, there were never claims
10   of --
11           THE COURT:  I understand, yes.
12           MR. CHEIFETZ:  Now, we heard earlier that the covered
13   persons here will not be participants in the suit, but that's a
14   gross over-simplification and not correct.
15           The reason that they are actual participants in this
16   suit is that they did allegedly have claims that they asked a
17   third party to go and pursue for them.  And for example --
18           THE COURT:  The fact that they might be a witness at a
19   trial doesn't necessarily mean they're parties.
20           MR. CHEIFETZ:  Well, let's take discovery, for
21   example, Your Honor.  The courts in this circuit and elsewhere
22   have made clear that where parties proceed by way of
23   assignments, it is as if those assignors were individual
24   litigants in the lawsuit for discovery purposes.
25           And that's because courts don't allow assignors to
```

 1  assign their claims as a sword and then use the shield of that

 2  to avoid being treated as parties for discovery purposes.  I

 3  can give the Court an example of a case.  It's *MSP Recovery*

 4  *Claims* --

 5        THE COURT:  When you say "treated as parties to the

 6  lawsuit" --

 7        MR. CHEIFETZ:  I'll read --

 8        THE COURT:  -- for diversity purposes or just using

 9  the term "somebody is a third party," meaning not -- an

10  individual who is not a party to a case, not a named party?

11        MR. CHEIFETZ:  Right.  For example, in the *MSP*

12  *Recovery Claims* case, it's 2023 WL 4563221, at 11,

13  (D.N.J. January 19, 2023), the court was dealing with whether

14  assignors had any obligations, discovery obligations, and how

15  that would work in an assignment context.

16        And the Court said that:  The assignee is on notice of

17  its obligation to provide assignor discovery as if those

18  assignors were individual litigants in the lawsuit.  The

19  assignors, in turn, having benefitted from transferring their

20  claims to MSP, the assignee, bear responsibility in cooperating

21  with this litigation.

22        So the idea that --

23        THE COURT:  I mean, it just seems obvious to me,

24  regardless of that analysis, that anybody who has knowledge

25  about the facts of a case are subject to discovery --

```
 1            MR. CHEIFETZ:  But it's not as a third --

 2            THE COURT:  -- whether they're assignors or not.

 3            MR. CHEIFETZ:  We're not talking about third-party

 4  witnesses here.

 5            The reason I'm pointing this out is because the courts

 6  treat assignors as if they were parties to the case, because

 7  discovery from parties is different than from --

 8            THE COURT:  Are they subject to having to answer

 9  interrogatories, as opposed to being deposed and producing

10  documents?

11            MR. CHEIFETZ:  Yes, we would submit that --

12            THE COURT:  They are?  Is there a case that says

13  that?

14            MR. CHEIFETZ:  Well, I'm not aware specifically with

15  respect to interrogatories, but I'm saying --

16            THE COURT:  Well, only parties have to answer

17  interrogatories, correct?

18            MR. CHEIFETZ:  Correct.

19            THE COURT:  So --

20            MR. CHEIFETZ:  I'm not sure if there's a case

21  specifically addressing interrogatories one way or the other,

22  but I cited --

23            THE COURT:  Well, it just seems obvious that an

24  assignor would have to give discovery.  That's not a surprising

25  proposition.
```

1          In that New Jersey case, was the assignor saying he or
2    she didn't have to give discovery?
3          MR. CHEIFETZ:  Yes, the assignee was resisting having
4    to provide discovery that they couldn't obtain --
5          THE COURT:  Well, may have been resisting, but this
6    seems so obvious to me that anybody who has any information,
7    relevant information about a lawsuit, whether assignors or
8    eyewitnesses or whatever, have to give discovery.
9          MR. CHEIFETZ:  Fair enough.
10          THE COURT:  And we all know in our practice that
11    people sometimes resist discovery, parties resist discovery and
12    non-parties resist discovery, and the courts have to get
13    involved in dealing with that.  I mean, people disregard
14    subpoenas.  That's part of life.
15          MR. CHEIFETZ:  That's right.  And that's fair.
16          All I was saying is, for example, you wouldn't need a
17    third-party subpoena under that line of authority because the
18    assignors would be treated as parties.
19          THE COURT:  Well, is that what the court said, that
20    the assignor didn't have to be subpoenaed?
21          MR. CHEIFETZ:  That wasn't the issue in that
22    particular case, but that's -- all I'm suggesting is the notion
23    that the covered persons here are not involved, they're not
24    participating in any way --
25          THE COURT:  I don't think anybody can dispute that.

```
 1          MR. CHEIFETZ:  Right.  And that's my point.  And the

 2   Mississippi citizens, for example, who are anonymous --

 3          THE COURT:  I understand.  And they're not going to be

 4   deposed.

 5          MR. CHEIFETZ:  More importantly, as we've said

 6   already, the covered persons retain a substantial legal and

 7   financial interest in the case.  That makes this different.

 8          If there had been an assignment for monetary

 9   consideration, as the Court suggested last time, then arguably,

10   arguably then Atlas is the only one with the claim that

11   matters.  Right?

12          But that's not what happened here.  And what happened

13   here is that the covered persons are agreeing to these terms

14   where they basically said you, Atlas, go and pursue my claims

15   and I retain the lion's share of the legal and financial

16   interest in those claims.

17          By any sort of common-sense understanding, the covered

18   persons do still have claims here.

19          THE COURT:  All right.

20          MR. CHEIFETZ:  And again, I mentioned *Sprint*.  It's

21   important because if *Hood* is to be read as requiring this Court

22   to determine there are multiple plaintiffs here, *Sprint*

23   supports that because *Sprint* says that mass assignment is a

24   form of multi-party joinder, multi-party joinder under

25   Rule 20(a).  It's analogous.
```

1          And if that's not enough, we also have a principle

2    dating back over 120 years from the Supreme Court in the *Waite*

3    decision and the line of authority that flows from *Waite*.  And

4    we identified this in our opposition brief at page 47 to 48,

5    where the Supreme Court has treated a single mass assignee for

6    collection as akin to multiple plaintiffs for jurisdictional

7    purposes.

8          Now, what was going on in those cases?  You had a

9    single named mass assignee that came into court and said for

10   diversity purposes, for amount in controversy, I can aggregate

11   all of the small claims of my assignors.

12         THE COURT:  But see, the Supreme Court, they may be

13   plaintiff, but in *Hood* they talked about named plaintiffs,

14   didn't they?  They used the term "named plaintiffs."

15         MR. CHEIFETZ:  They talked about named plaintiffs, but

16   there was only one named plaintiff in *Waite*.

17         THE COURT:  And that was the problem for purposes of

18   mass action.

19         MR. CHEIFETZ:  But in *Waite* the Supreme Court treated

20   that one named plaintiff as multiple plaintiffs and it --

21         THE COURT:  I understand treating them is different

22   than naming them.

23         MR. CHEIFETZ:  That's right.

24         THE COURT:  That's the point --

25         MR. CHEIFETZ:  I understand.

1          THE COURT:  -- the Supreme Court talks about.  So they

2    may be treated as.  But again, the Supreme Court in *Hood* said

3    we're not talking about real parties in interest.

4          MR. CHEIFETZ:  Neither am I.

5          THE COURT:  So -- all right.

6          MR. CHEIFETZ:  I'm talking about plaintiffs.

7          Again, the Court can obviously disagree with my

8    interpretation of named plaintiffs.  I don't think *Hood* can

9    be limited that narrowly, which would elevate form over

10   substance.

11         THE COURT:  I think I understand your argument.

12         MR. CHEIFETZ:  Can I make just one final point about

13   *Waite*?

14         Because the important point is, in *Waite,* there had

15   been a long line of authority, and the Supreme Court says that

16   a single plaintiff can aggregate as many claims as that single

17   plaintiff wants.  And if one single mass assignee would be

18   treated as a single plaintiff by the Supreme Court, it could

19   have just adopted that longstanding authority and let that mass

20   assignee aggregate as many claims as he wanted, but the Supreme

21   Court didn't do that.  It didn't do that because it would have

22   been to contravene an important congressional statute with

23   respect to jurisdiction if a mass assignee could avoid the

24   requirements not in controversy by aggregating.

25         So what rule did the Supreme Court apply in

1   *Waite* and other cases?  It applied the rule that multiple

2   plaintiffs cannot aggregate claims to meet jurisdictional

3   requirements.

4          Now, it's a different situation, it was an attempt to

5   get into federal court, but the logic that the Supreme Court

6   has applied for 125 years is the same here, is the same,

7   because if you allow Atlas to be treated as only one assignee

8   named plaintiff because it named only itself, it would elevate

9   form over substance in the way that the Supreme Court rejected

10  for 120 years in *Waite* because in reality Atlas stands in the

11  shoes of 19,000 people who are aggregating their claims in a

12  single lawsuit, and that's what CAFA mass action jurisdiction

13  is intended to allow.

14         THE COURT:  All right.

15         MR. CHEIFETZ:  Can I just address --

16         THE COURT:  Go ahead.

17         MR. CHEIFETZ:  -- if I may, the cases that plaintiffs

18  have said demonstrate that you should not extend *Hood*'s holding

19  beyond the parens patriae?

20         THE COURT:  You may.

21         MR. CHEIFETZ:  Thank you.  I appreciate that.

22         The plaintiffs say that the Ninth Circuit in the

23  *Liberty Mutual* case shows how courts will extend outside the

24  parens patriae context.  As counsel said, that was an insurance

25  subrogation case.

```
 1            THE COURT:  Right.
 2            MR. CHEIFETZ:  That matters.  That's an important
 3   fact.  It shows why these cases are different.
 4            In the insurance subrogation context, an insurance
 5   company pays out its insured, it has a contractual obligation.
 6            THE COURT:  Right.
 7            MR. CHEIFETZ:  It then --
 8            THE COURT:  And sues the tort feasor.
 9            MR. CHEIFETZ:  And by operation of law, it gets a
10   subrogation right and it goes and sues the tort feasor.  That's
11   the insurance company's claim.
12            The insurance had no claim anymore --
13            THE COURT:  They've been paid.
14            MR. CHEIFETZ:  They've been paid.  And the court in
15   Liberty Mutual said that in that case the insurance had no
16   ongoing financial or legal interest in the claim anymore.
17   That's an important distinction that does not apply here.
18            The other case, as counsel said, was a case
19   involving a derivative suit.  Derivative suit where the theory
20   in that case was you should consider the beneficial equity
21   holders of the company as named parties or additional
22   parties.
23            Now, a derivative suit is on behalf of the company,
24   it's only one party with a claim.  The equity holders don't
25   have claims.  Again, a very different and distinguishable line
```

1  of authority.

2       So I would just say, Your Honor, with respect to

3  extending *Hood* beyond its facts, that those cases don't stand

4  for the broader proposition, they had nothing to do with mass

5  assignments, that the reasoning in *Hood* should be extended that

6  far to contravene what the Supreme Court said in *Sprint* about

7  mass assignments, in *Waite* about mass assignments, and

8  elevating form over substance in *Knowles* with respect to CAFA

9  jurisdiction.

10      And just lastly, Your Honor, the Third Circuit has

11 observed something I think that's important, and that is

12 that -- this is in the *Robert Mabe* case, which came after *Hood*

13 -- that on occasion plain and unambiguous language ends up

14 stating what was not Congress's intent, and in those instances

15 we are obligated to construe statutes sensibly and avoid

16 constructions which yield absurd and unjust results.

17      And the Third Circuit in *Mabe* cited to Supreme Court

18 authority which made a similar point, and I just want to read

19 it to the Court because I think it's important here.

20      The Supreme Court in the *United States vs. American*

21 *Trucking* case, that the Third Circuit cites said:  Even when

22 the plain meaning did not produce absurd results but merely an

23 unreasonable one plainly at variance with the policy of the

24 legislation as a whole, this court, the Supreme Court, has

25 followed that purpose rather than the literal words.

1        And again, elevating *Hood* or reducing *Hood* to the

2   overly-simplistic proposition that the Court must only look at

3   the named plaintiffs overlooks the entire context of *Hood*, the

4   critical factual differences between proceeding by mass

5   assignments in parens patriae litigation, and it would elevate

6   form over substance exactly in the manner that the Supreme

7   Court rejected ten months prior to *Hood*.

8        Thank you, Your Honor.

9        THE COURT:  All right.  Thank you.

10       All right.  We'll hear about 1332(d) and class

11  actions.  Good morning.

12       MS. HUTCHINS:  Good morning, Your Honor.

13       May I please the Court, my name is Sarah Hutchins and

14  I represent Blackbaud, B-L-A-C-K-B-A-U-D, and a number of other

15  defendants that have moved on the alternative theory of class

16  CAFA action.

17       THE COURT:  Right.

18       MS. HUTCHINS:  Just for the record, we join in the

19  consolidated brief that plaintiffs should be subject to federal

20  jurisdiction because Atlas is not a real party in interest and

21  because there's mass action under CAFA, but we offer this

22  alternative argument.

23       Now, at the outset -- and I don't concede that any of

24  the class elements have actually been met.  But at a bird's-eye

25  view of this case, it strikes as a class action.

```
 1            What we have here, if, in the Court's view, the
 2   assignor covered persons are not parties with claims appearing
 3   in this matter, then what we have is one party under a new law
 4   and pursuant to a statutory assignment clause standing before
 5   this Court ostensibly on its own behalf and on behalf of 20,000
 6   others who are not before this Court but seeking injunctive
 7   relief and other relief both on Atlas's behalf and on these
 8   absent 20,000 individuals' behalf.
 9            And when you look closer, when you look to see if all
10   of the elements of CAFA removal are met and you strip away the
11   artifice like Erie II instructs, then what we are looking at
12   here in detail is a class action in disguise.
13            Now, I'll address this more when I talk about Daniel's
14   Law, but I do want to dispute --
15            THE COURT:  Well, the statute -- the cases certainly
16   haven't been brought under a New Jersey class action relief,
17   you would agree with that?
18            MS. HUTCHINS:  I would not, Your Honor, actually.  And
19   I don't think that --
20            THE COURT:  Not under the New Jersey class action
21   rule?
22            MS. HUTCHINS:  Not expressly.
23            THE COURT:  No.
24            MS. HUTCHINS:  But many cases, as cited in our brief,
25   confined that a class action in disguise is brought under
```

1  Rule 23 analogue even when it's omitted, because to hold
2  otherwise would allow a plaintiff to do what Atlas attempts to
3  do here in avoiding class action jurisdiction, essentially to
4  leave it out, and then the benefits of class action removal to
5  both the covered persons in this case that have assigned their
6  case to Atlas and the due process protections that would go to
7  defendant are in jeopardy.
8       But it's not what Mr. Shaw characterized as any
9  assignment of any contract or any statute is going to make it a
10 class action.  What we are arguing here is whether there's a
11 class action in disguise brought under a statute or rule,
12 expressly or wrongly omitted from the complaint itself, that
13 allows a litigant to represent the rights of themselves and the
14 rights of others.
15      THE COURT:  Well, you'd have to meet, of course, the
16 standards under the class action rule, even if the class action
17 rule is not identified, correct?
18      MS. HUTCHINS:  That's absolutely true, Your Honor.
19      THE COURT:  You would have to show numerosity.  And
20 there are a lot of people here, thousands.
21      But what about the issue of commonality and
22 typicality?  Isn't that going to depend on the standard of
23 liability if the standard is -- if Daniel's Law is a no-fault
24 statute, that's one thing.
25      Let's assume for the moment that plaintiffs are going

```
 1   to have to prove negligence on the part of your client and the
 2   other defendants.  Doesn't that eliminate class action status
 3   because you're not going to have typicality, you're not going
 4   to have commonality?
 5             Each -- you'd have to prove the negligence of each
 6   defendant.  That would remove it from class action status right
 7   away, wouldn't it?
 8             MS. HUTCHINS:  Your Honor, I disagree.
 9             THE COURT:  Why?
10             MS. HUTCHINS:  That goes to the liability of each
11   individual defendant in each of their cases, but not whether
12   the class members themselves, along with Atlas as the assignee,
13   hold typical claims.  And not every factual legal --
14             THE COURT:  Yeah, but if that's the heart of it, you
15   know, was your client negligent.  Did they not remove the names
16   because a hurricane moved through the town where you're
17   headquartered and you weren't able to deal with it?  Or
18   somebody else had a fire?  Or the computer system was jammed so
19   that you couldn't remove the names?
20             I mean, it's going to -- isn't it going to be
21   fact-based with respect to these 75 or 40 cases, whatever the
22   number is, so that would certainly undermine the class action
23   status.
24             MS. HUTCHINS:  Your Honor, I again disagree.  I think
25   you look at each complaint and whether a class action in
```

1    disguise appears.  And there's a potential class of

2    individuals -- or whoever the class ends up being defined at a

3    later stage -- as to each independent complaint and whether or

4    not a negligence status is read in to --

5            THE COURT:  So you would say that you're going to

6    have -- here we have not one class, but we have 75 different

7    classes?

8            MS. HUTCHINS:  That's correct.  And it might be

9    combined in a multi-district litigation.  That's not -- that

10   structure in and of itself is uncommon.  What is uncommon is

11   the way that the plaintiff here today attempts to represent the

12   claims of themselves and 20,000 others without the protections

13   to the class members that are set forth in Rule 23 and the due

14   process protections to the defendants.

15           And it's very clear that Atlas considers itself as

16   representing themselves and these other individuals.  The

17   assignments are expressly authorized by Daniel's Law as a

18   mechanism to enforce a covered person's rights.  That's what

19   they say in their brief.

20           With this lawsuit, Atlas attempts to enforce

21   compliance with Daniel's Law for those covered persons, for

22   others.

23           "We are taking action as Atlas."  This is Mr. Atkins'

24   deposition.

25           "And we are attempting to prosecute them all to

 1  achieve compliance and a just outcome for the folks involved."

 2          All of those strike as the hallmark of proceeding

 3  before this Court, this is how Atlas gets here as a

 4  representative of themselves and others.

 5          The plaintiffs cite to *Erie* in their briefing as

 6  barring this, and we believe that the reliance on *Erie* and the

 7  way that it's characterized by the plaintiffs is overstated

 8  and, frankly, misapplied.

 9          The plaintiffs imply that *Erie I* and *II* imply that a

10  factual review is sufficient, that this Court need only look to

11  whether the plaintiffs filed this action under a New Jersey

12  statute or rule of procedure analogous to Rule 23.  They did

13  not.  The inquiry ends there.  That is not what *Erie* says.

14          *Erie II,* in fact, warns against such a myopic focus on

15  forum.  It says if a complaint does not satisfied the

16  jurisdictional requirements on its face, then you must cut

17  through the artifice to identify whether the case is in

18  substance, in substance, whether the conglomeration of 20,000

19  individuals not before Your Honor in substance is an interstate

20  class action.

21          So the application can be distinguished --

22          THE COURT:  So would notice have to be given to all of

23  these individuals?

24          MS. HUTCHINS:  Yes, Your Honor.  And notice

25  is inherent in the Daniel's Law statute.  Or if under *Erie* the

1  Court finds that this case has been brought under

2  New Jersey's class action statute, notice is inherent in either

3  instance.

4       THE COURT:  Which rules would I have to follow, the

5  New Jersey rules or the federal rules for class action?

6       MS. HUTCHINS:  For whether there's a state

7  analogue?

8       THE COURT:  When you say it's a class action, do I

9  follow the federal rules on class actions, Rule 23, or do I

10 have to follow the state rule?

11      MS. HUTCHINS:  Well, Your Honor, I think in either

12 instance Rule 23 affords latitude to Your Honor to make the

13 appropriate protections in place, specifically to Your Honor's

14 point on notice, as to class notice, and I think that would be

15 under the Federal Rule 23.

16      But in either instance, notice can be accomplished

17 both in the statute -- in looking for an analogue under

18 New Jersey's class action statute or under Rule 23 to

19 remove it to federal court for jurisdictional purposes and

20 treat these lawsuits, these unusually filed lawsuits as a class

21 action.

22      Again, looking back to *Erie*, *Erie* is different.  The

23 parties are different.  The plaintiffs attempt to say that *Erie*

24 says you must specify in writing the rule or statute that you

25 are proceeding under that is representative in nature, but *Erie*

1    does not go that far.

2         In fact, the *Erie* court did what we're asking Your

3    Honor to do here today, which is they looked beyond the

4    complaint to see what the representative statutes could be.

5         So both -- an exchange in *Erie*, the court was bound by

6    the fact that an association is properly understood as a suit

7    by one entity in that instance, not by a conglomeration of

8    individuals.  They were bound by the *Long* decision in that case

9    that found that specific as far as how an association can be

10   viewed under Pennsylvania law.

11        The court noted specifically in *Erie I* that an

12   exchange was not a stand-in for its subscribers by statute.  An

13   exchange was essentially its own legitimate entity, single

14   entity, suing its managing agent and its attorney-in-fact on

15   one single legitimate issue.  And that's unlike here where we

16   would say -- and I think it's clear to the Court -- that Atlas,

17   with respect to the class action argument, is standing in the

18   shoes of other, especially in seeking the injunctive relief

19   that 100 percent flows to the covered persons.

20        In *Erie I* the court also noted that a legal

21   association of the members and the exchange existed independent

22   of the suit and that all of the relief in *Erie* flowed to the

23   exchange, which as we've discussed multiple times today, Your

24   Honor, that's not the case.

25        The second distinguishing factor of the *Erie* cases is

1   that the courts were limited, *Erie* courts were limited because

2   the exchange could only sue, could only get to court as an

3   association under Pennsylvania law.  Again, that's not what we

4   have here today.

5          The suit was focused on Pennsylvania's procedural

6   statute of 2152 because that's the only way that the *Erie*

7   exchange could get into court.  The court attempted and looked

8   beyond the pleadings.  They did a factual analysis to see is

9   there another representative statute that *Erie* could be

10  proceeding under, and they said no.

11         They looked specifically at Pennsylvania Civil

12  Procedure Statute 17 -- Rule 1702.  But because *Erie* was an

13  exchange and dealt with an exchange, it could not be proceeding

14  under that statute.  It had to be proceeding under 2152.  And

15  the court was bound by prior Pennsylvania law that had

16  forbidden suit by an unincorporated association to be

17  maintained as a class action.  They had no other avenue, no

18  representative statute to look at but 2152.  And they did the

19  analysis specific to that statute and found it was not an

20  analogue.  But that statute is very different from New

21  Jersey's class action statute or Daniel's Law, as we see here

22  today.

23         *Erie II* instructs us to look behind the pleading

24  artifice, to look beyond it and not let a plaintiff rest

25  inappropriately on an omission.  And I proffer that if *Erie* had

```
 1   come out differently, it would come out differently if it was

 2   an individual bringing a suit against the indemnity in that

 3   circumstance in some other issue, and it was silent as to how

 4   it got there, but it presented itself as representing the

 5   interest of others.

 6          The court demonstrates that it would have looked at

 7   Pennsylvania Rule 1702 to find potentially a class action if

 8   the other elements of a class action in disguise presented

 9   themselves.

10          THE COURT:  All right.

11          MS. HUTCHINS:  So this presents here a class action in

12   disguise within *Erie*'s holding for purposes of jurisdictional

13   review.  First, when looking at the Rule 23 analogue, which is

14   the only -- it's notable that it's the only element the

15   plaintiffs have said is missing here, and they have -- they are

16   the ones that decidedly and expressly set forth the -- or

17   decided what to write down in their complaint, and they decided

18   to omit a Rule 23 analogue --

19          THE COURT:  First of all, the plaintiff is the master

20   of his or her complaint.

21          MS. HUTCHINS:  It is.  But CAFA provides that a class

22   action in disguise can be found when they are omitting the

23   representative nature and rule or statute that they proceed

24   under.  It's not dependent on what they put in writing but how

25   the case presents itself, whether --
```

1          THE COURT:  That requires me to look at the

2     assignments.  If they're total assignments, they're not

3     representing anybody, they're representing themselves.

4          MS. HUTCHINS:  Your Honor, I don't think you need to

5     look at the assignments.  You can look at, as I stated, under

6     New Jersey's class action statute or you can look under

7     Daniel's Law where the injunctive relief inherently flows to

8     the assignors.  The New Jersey legislature could not have

9     intended otherwise, because to do that would mean that an

10    assignee would potentially settle and not seek injunctive

11    relief, not seek the entire purpose, stated purpose of New

12    Jersey's Daniel's Law, which is to effectuate a takedown,

13    or they could simply not pursue it at all, have claims

14    assigned to them that decide not to pursue the injunctive

15    relief aspect.

16         The New Jersey legislature could not have intended

17    that with respect to Daniel's Law.  The injunctive relief would

18    continue to flow to the covered persons.

19         We don't concede any of the elements of Rule 23 are

20    satisfied, but I think it's particularly notable that the --

21         THE COURT:  They are not satisfied?

22         MS. HUTCHINS:  That they're not satisfied to establish

23    a class.  But for purposes of the jurisdictional discussion

24    that we're having here today, the case itself presents the

25    frameworks that's appropriate for us to consider that this is

1   jurisdiction that should be in federal court.

2           And I -- the plaintiff shows that they need this to be

3   a complaint in substance in their brief at page 22.  They state

4   that while plaintiffs can just as easily proceed as a class

5   action or a mass action, especially given the breadth of

6   assignments from the covered persons, plaintiffs are

7   merely carrying out what the state allowed, lawsuits by

8   assignment.

9           And that's exactly what the legislature intended to

10  avoid with the broad application of CAFA where it does not

11  require a rule but finds that it is preferable to have

12  interstate class actions heard in federal court for the

13  protections that are afforded to the members in --

14          THE COURT:  Do you think the legislature was even

15  thinking about the issue of class actions when they passed this

16  statute?

17          MS. HUTCHINS:  I am sorry, the --

18          THE COURT:  Do you think the legislature was thinking

19  about class actions when it passed this statute?

20          MS. HUTCHINS:  When it passed Daniel's Law?

21          THE COURT:  Yes.

22          MS. HUTCHINS:  Well, I think that they were thinking

23  about protections for covered persons.  And when --

24          THE COURT:  Right.

25          MS. HUTCHINS:  And when the assignment clause was

1    added to afford -- some of the elements that we think about

2    when we think about the benefits of the numerosity analysis

3    and -- which is to allow -- where joinder is impractical, to

4    allow those that are not inclined to appear in federal court to

5    assign their claims to others, then yes, it could be viewed

6    that way.

7        But I also don't think CAFA is viewed that narrowly as

8    what did the state legislatures intend when they wrote a

9    particular representative statute.  It's whether it's a class

10   action in disguise, whether the interest of others are being

11   represented by a litigant, and those others are not before the

12   Court.

13       THE COURT:  All right.

14       MS. HUTCHINS:  The tactical refusal to cite an

15   analogue should not be permitted, and there's many cases in our

16   brief that address this.  To hold otherwise would prioritize a

17   complaint's use of magic words or not.  And in large part, the

18   plaintiffs did not address many of those cases.

19       To the extent, though, that -- the cases I would say,

20   Your Honor, make the specific point that you cut through the

21   artifice, you can find a class action, and whether or not the

22   rule is specifically memorialized in the complaint, despite the

23   fact that the plaintiffs are the masters of the complaint, is

24   not enough to disavow the legislature's protections when

25   they enacted CAFA, to push these types of cases to federal

1    court.

2         But to the extent that a rule needs to be read, that

3    appearing within the four walls of the complaint, then I

4    believe that Daniel's Law can satisfy that analysis, though I

5    don't think that's what *Erie* requires.

6         As I said before, Mr. Shaw -- I don't even know if

7    it's overly simplified, but essentially misstated what we argue

8    in our brief, that any clause, contract, any law, any statute,

9    anything could be characterized as a class action merely if

10   there's an assignment involved.

11        That is not at all what we're saying.  We're saying

12   that this case, that's very uniquely presented to this Court,

13   all of these cases, presents just the circumstance where CAFA

14   was put into place to protect those litigants and the

15   defendants in this case for their due process protections, and

16   that is whether the statute has those hallmarks of typicality,

17   commonality, adequacy, and whether it's presented in an action

18   in substance that's a class action in disguise.

19        And we think Your Honor can find that, again,

20   under New Jersey's class action statute, but also under

21   Daniel's Law.

22        When --

23        THE COURT:  Go ahead.

24        MS. HUTCHINS:  When looking at whether a law can

25   satisfy that analogue analysis, the governing principle is

```
1   whether the state law at a minimum provides a procedure by

2   which a member of a class whose claim is typical of all members

3   of the class can bring an action not only on their behalf but

4   also on behalf of others.

5           And the Falcon case tells us that you can merge and

6   you should merge the criteria of commonality, typicality, and

7   adequacy, and they're merged here in that assignment clause

8   that we've been discussing.

9           Daniel's Law contains sufficient representative

10  structure through that assignment clause because it allows a

11  proper assignee, which again, we do not concede, but for

12  purposes of jurisdiction the hallmarks are present, it allows

13  the proffer assignee to sue on its own behalf and on behalf of

14  others.

15          The class members retain an interest like we just

16  talked about --

17          THE COURT:  I think we're going to have to give the

18  court reporter a break.  She's been working very hard and we've

19  been at it over an hour and a half.

20          So you can finish when we -- ten minutes.

21          MS. HUTCHINS:  Yes, Your Honor.

22          THE COURTROOM DEPUTY:  All rise.

23          (Brief recess taken from 11:36 a.m. to 11:46 a.m.)

24          THE COURT:  All right.  Ms. Hutchins, you may proceed.

25          MS. HUTCHINS:  Thank you, Your Honor.  I'm almost done
```

 1  and I'm happy to answer any --

 2          THE COURT:  I'm sorry to interrupt, but I know the

 3  court reporter needed a break.

 4          MS. HUTCHINS:  I benefitted from it too.  The argument

 5  got shorter.  I'm happy to address any questions of Daniel's

 6  Law as to Rule 23 analogue but --

 7          THE COURT:  Well, you see, Daniel's Law

 8  doesn't require numerosity.  In other words, if you're using --

 9  one person can bring a lawsuit under Daniel's Law or five or

10  ten.  Let's say here that Atlas had only brought a suit -- I

11  use the words "on behalf of."  Those words are not used

12  in the complaint -- ten assignors.  Would that be a class

13  action?

14          MS. HUTCHINS:  No, Your Honor.  If there's -- if I

15  understand Your Honor's question correctly, if Atlas proceeds

16  as the assignee of one assignor, that's not presenting itself

17  as a class action, that's --

18          THE COURT:  Well, let's say it was ten.

19          MS. HUTCHINS:  And likewise.  We look at the analysis

20  of when CAFA would apply when you reach numerosity --

21          THE COURT:  Right.

22          MS. HUTCHINS:  -- just as you would in any other

23  instance.

24          THE COURT:  But Daniel's Law doesn't require

25  numerosity.

1          MS. HUTCHINS:  And CAFA doesn't say that it needs to

2    have it.  There's the *Exxon* case specifically talks about how

3    you don't need every element -- I am sorry, that CAFA doesn't

4    disclose the criteria of what a rule analogue is.  And many

5    other cases, including the *Purdue* case we cite, says that the

6    analogue doesn't need to have all of the conditions of Rule 23.

7    And the most important ones are the ones that we talked about

8    already, which are the adequacy, technicality, and commonalty

9    element that is present in the assignment clause.

10         But as I mentioned earlier, aspects of the amendment

11   to add the assignment clause have hallmarks of that numerosity

12   analysis, including the impossibility of enjoining all of the

13   individuals.  They covered persons in this case that wanted to

14   exercise takedown rights and assign their claims to Atlas and

15   may not want to appear in a federal litigation.  And the way

16   that this case presents itself satisfies that other

17   consideration of numerosity.

18         Your Honor, I want to end with addressing one last

19   point, which are the consequences in this case, especially to

20   the assignors, of not finding a mass or class action under CAFA

21   in this instance.

22         Again, as we've all stated, this is a unique

23   presentation and the covered persons are not -- may not be

24   viewed as being here to represent their interests, but

25   certainly they still have them.  And without CAFA, mass or

1  class, the protection to the class members that would be

2  present in the event of the class action, be it under Federal

3  Rule 23 or Your Honor's orders with respect to additional

4  notice requirements, those are not present.

5       And I think that's particularly notable here where on

6  page 29 of the plaintiffs' brief they noted themselves to not

7  be bound, to not be bound as the class representative, to not

8  have any of the responsibilities to those covered persons.

9  They act unbound without rules.  And that's exactly the

10  reason that the legislature enacted CAFA, to protect

11  not-present parties and their interest, to ensure that, for in

12  this case --

13       THE COURT:  Isn't that true in any case where there's

14  an assignor and an assignee?

15       MS. HUTCHINS:  I am sorry.  Say that again, Your

16  Honor.

17       THE COURT:  Same situation.  Wherever an assignor

18  makes an assignment to an assignee, you -- if it's an absolute

19  assignment, you give up your rights.

20       MS. HUTCHINS:  But that is not the case here and

21  Daniel's Law --

22       THE COURT:  And if there's a breach of the agreement,

23  then one can sue the other.

24       MS. HUTCHINS:  A contractual assignment that may or

25  may not have --

 1           THE COURT:  Aren't assignments all -- they're are

 2  contractual, aren't they, assignments?

 3           MS. HUTCHINS:  Not here.  Daniel's Law has an

 4  assignment clause in the statute itself that contemplates the

 5  idea that someone else --

 6           THE COURT:  No, but it doesn't require an assignment,

 7  it just gives --

 8           MS. HUTCHINS:  It doesn't.

 9           THE COURT:  -- the parties the right to.  Assignments

10  are generally done under common law, but this is just a

11  statutory right of assignment.

12           MS. HUTCHINS:  It does.  But when --

13           THE COURT:  Because it's a little unusual in the sense

14  that you're assigning a tort claim, I think.  Because

15  assignments are usually contractual claims that are assigned.

16           MS. HUTCHINS:  Yeah.  And --

17           THE COURT:  So I don't know that absent a statute, you

18  can assign your -- if I'm injured in an automobile accident, I

19  don't know that I can assign my claim to an assignee who pays

20  me X dollars, and then the assignee goes out and tries to

21  collect more.  I don't think you can, generally you can do

22  that.

23           MS. HUTCHINS:  Your Honor, we agree --

24           THE COURT:  But the statute here permits it, so that's

25  a different thing.

1          MS. HUTCHINS:  This is a unique circumstance, exactly

2     the type of situation because of the presentation that is

3     brought here today and because the -- especially with respect

4     to the injunctive rights, those rights belong a hundred percent

5     to those covered persons.

6          THE COURT:  Right.

7          MS. HUTCHINS:  That presents a unique analysis that

8     CAFA was expressly and our legislature expressly intended to

9     have those protections for those non-members.

10          Thank you, Your Honor.

11          THE COURT:  Thank you very much.

12          Before we hear from the plaintiffs, we need to hear

13     from the lawyers who are alleging fraudulent joinder.

14          Good morning.

15          MR. PRATT:  Good morning, Your Honor, Marcel Pratt

16     from Ballard Spahr on behalf of the four Thomson Reuters

17     defendants in case 24-4269.  And I will be addressing the

18     fraudulent joinder argument as it relates to the Thomson

19     Reuters defendants.

20          This case against Thomson Reuters relates to

21     two non-public subscription-only products that are owned,

22     operated, and sold by Thomson Reuters entities that are not

23     parties to this case.  And what Atlas has done here is they've

24     brought claims arbitrarily against two entities that are

25     Canadian citizens and two non-diverse entities that are

1  citizens of Delaware, which has the effect of destroying

2  diversity.

3          And we contend that the joinder in naming of those two

4  non-diversity entities is fraudulent because they have no

5  connection to this controversy.  And it's well settled in the

6  Third Circuit -- Your Honor mentioned that *Batoff* case earlier,

7  that joinder is fraudulent where there's no reasonable basis in

8  fact or colorable ground supporting the claim against a joined

9  defendant.  And here --

10         THE COURT:  Right.  But you have to look at the

11 complaint, what do they say about these non-diverse defendants?

12 And there's a declaration.  I don't remember whether it's in

13 your case it's an affidavit or declaration, but in any event,

14 the same thing for present purposes, saying that in effect they

15 had -- there's no connection with -- they've never done any of

16 this.

17         MR. PRATT:  Correct.  Right.

18         So that's what -- we did submit a declaration.  But

19 you're right, Your Honor, we can start with the complaint

20 because the complaint against Thomson Reuters has no specific

21 allegations against the two non-diverse entities.  It's just

22 boilerplate language that's used against all the defendants,

23 including the ones more generally in the litigation, but there

24 are no specific allegations as it relates to the two

25 non-diverse entities.

 1          And in response to that, we filed our notice of

 2   removal, which does attach an affidavit, and we explained to

 3   Atlas that the website identified in your complaint is not

 4   owned or operated or maintained by the two entities that

 5   you've named, the Delaware citizens, and the email address

 6   to which you sent the takedown notices is not owned,

 7   operated, or maintained by the two entities that are Delaware

 8   citizens.

 9          And in response to that, they filed their motion for

10   remand and they didn't address that at all.  They essentially

11   gave us a two-sentence footnote where they didn't confront the

12   facts and they said collusive joinder and fraudulent joinder

13   are the same thing, and that's all they said.

14          And I think Your Honor pointed out earlier that Atlas

15   could have engaged in discovery, but they made a deliberate

16   choice not to.

17          THE COURT:  And of course, with the fraudulent

18   joinder, I don't think motive or purpose is relevant.  The

19   question is whether there's a colorable claim.

20          MR. PRATT:  Correct, yeah.  Motive is not -- we're not

21   saying that there had to be motive.

22          THE COURT:  And the question is, am I limited

23   solely to the complaint in making that determination or may I

24   take into consideration an affidavit or a declaration that's

25   filed?

1          And we all have to recognize it's not a 12(b)(6)

2    motion.

3          MR. PRATT:  Correct.

4          THE COURT:  It has to go far beyond that.  It has to

5    be totally without substance, frivolous, are different words

6    that are used, but it's not just do they state a claim for

7    relief.

8          MR. PRATT:  That is absolutely correct, Your Honor.

9    And you can rely on affidavits, and I know in other cases that

10   we've cited Your Honor has relied on affidavits in conducting a

11   fraudulent joinder analysis.

12         And Your Honor can look to information outside of the

13   complaint for indicia of fraudulent joinder.  And that's in the

14   cases that we cite.

15         But like I said, it's very telling that in the motion

16   for remand the fraudulent joinder argument was addressed in a

17   simple footnote without confronting any of the evidence.  And

18   so in our opposition, what we did is we provided additional

19   information that said these two entities have no connection to

20   the controversy and, by the way, they don't even have the legal

21   authority or ability to remove the information from these

22   products.

23         And then we took it a step further and said there's

24   publicly-available information that shows you which entities

25   are actually connected here.  There's publicly-available

1  information that shows which entities own, operate, and sell

2  the products, and there's also information that shows which

3  entities, you know, own and operate the email address to which

4  you've sent the takedown notices.

5       And in response to that, we have Atlas's reply

6  which, again, doesn't confront the evidence.  What they did

7  was say we're asking the Court to conduct a merits analysis,

8  which we're not, and then they respond with two pages of

9  string cites.  Right?  But, again, they fail to engage on the

10  evidence.  And I think there's no greater indicia of

11  fraudulent joinder than just a simple failure to engage with

12  the facts.

13       And also, Your Honor, I heard counsel for Atlas

14  earlier say that there was some website they saw that connected

15  the fraudulently joined defendants to the case.  My response to

16  that is, what website?  Because it's not cited in the

17  complaint, it's not anywhere in the record, and that's because

18  it doesn't exist.

19       And so, Your Honor, where we are with this is we have

20  evidence via the declarations that we submitted, they're

21  unrebutted and uncontested.  Atlas has had three bites at the

22  apple.  They've had the complaint, the motion for remand, and

23  the reply, and they've engaged with the facts not at all; they

24  also had the opportunity to take discovery and they didn't; and

25  then today, if we want to consider that the fourth bite at the

1    apple, what they did was refer to a website that is not on the

2    record and doesn't exist.

3            THE COURT:  All right.

4            MR. PRATT:  Thank you, Your Honor.

5            THE COURT:  Thank you.

6            Anyone else?

7            MR. DOMINO:  Good morning, Your Honor.  Tyler Domino

8    for MyHeritage defendants in case 24-cv-4392.

9            THE COURT:  Yes.

10            MR. DOMINO:  I won't take too much of your time, he

11    just argued most of what I was going to say, but I want to

12    focus on my client specifically.  There were two entities that

13    were sued:  MyHeritage Limited, which is an Israeli company;

14    and MyHeritage USA Incorporated, which is --

15            THE COURT:  In Delaware.

16            MR. DOMINO:  Incorporated in Delaware, that's correct.

17            And as we said in the declaration, MyHeritage USA has

18    nothing to do with the only allegations that are in the

19    complaint.

20            The complaint is very specific that MyHeritage.com was

21    disclosing names and addresses and potentially phone numbers,

22    and that they sent takedown requests to privacy@MyHeritage.com,

23    but MyHeritage USA has nothing to do with MyHeritage.com or

24    privacy@MyHeritage.com.  They were on a different website

25    called Geni.  And there's no allegations about Geni anywhere in

1  the complaint, which we put in our affidavit.

2          And Your Honor focused on a key issue, can we look at

3  affidavits?  And the answer to that is unequivocally yes.  The

4  Third Circuit in Bristo(PH) said you must look at evidence

5  outside of the complaint.  There's many district court cases

6  looking at affidavits just like the ones we put in.  We cite

7  these at page 7 of our supplemental brief.

8          And the affidavits look just like the ones here, which

9  say we don't have a connection with this lawsuit and so,

10 therefore, we're fraudulently joined.

11         What the plaintiffs say in response is, you know,

12 there's lots of ways to disclose addresses and we're trying to

13 narrow Daniel's Law only to people that own certain websites,

14 but they're actually one step ahead.  We're one step behind

15 that.

16         All of those activities of disclosure are only illegal

17 under Daniel's Law if you first receive a takedown notice or

18 sent one and receive one.  Disclosing names and addresses is

19 perfectly legal on its own.  You have to receive a takedown

20 notice.

21         And so because MyHeritage USA does not operate or have

22 any control over or anything to do with the only email address

23 they allege in the complaint that was sent takedown requests,

24 Daniel's Law just doesn't apply to them at all.

25         If Your Honor has any questions, I would be happy to

 1  answer them.

 2          THE COURT:  Thank you very much.

 3          Mr. Shaw, you may respond to everything that's been

 4  said for the last hour or more.

 5          MR. SHAW:  Thank you, Your Honor.  Adam Shaw for the

 6  plaintiffs.

 7          Do you mind if we go in reverse order, would that be

 8  okay?

 9          THE COURT:  Whatever order you would like to go in.

10          MR. SHAW:  The affidavits that they submitted are

11  quintessential fact issues.  They want the Court to look at the

12  affidavits to make a determination that they don't --

13          THE COURT:  The Court's permitted to looked at

14  affidavits in a fraudulent joinder matter, aren't we?

15          MR. SHAW:  Not to the extent that they're asking for

16  it.

17          THE COURT:  What do you mean?

18          Well, I guess the question is whether or not the

19  analysis would be a 12(b)(6) or whether or not based on the

20  affidavits, the uncontradicted affidavits, the claim would be

21  frivolous or not colorable, whatever words you want to use that

22  the Third Circuit uses in *Batoff*.

23          So that's really what I have to decide; isn't that

24  correct?

25          MR. SHAW:  That is correct.  And but I don't -- I

 1  think if you followed what they're asking you to do, you would

 2  be making a determination they didn't violate Daniel's Law,

 3  which is the merits.

 4          I do agree that you could look to see whether we added

 5  a party --

 6          THE COURT:  Well, if I found that were frivolous, I'm

 7  also deciding the law is not being violated.

 8          I mean, that's --

 9          MR. SHAW:  True.  But our allegations in the complaint

10  didn't come from nowhere, that -- he's suggesting that we --

11  they put in information about websites and who owns it or

12  controls it.

13          THE COURT:  The affidavits are, in effect, saying that

14  and they're not contradicted.

15          MR. SHAW:  Your Honor --

16          THE COURT:  I mean, what if you sued the, as I said,

17  the governor of New Jersey, the governor of Pennsylvania who --

18  and the governor comes back and says I had nothing to do with

19  these data brokers or websites?

20          MR. SHAW:  True, but --

21          THE COURT:  And you have no contradictory affidavit,

22  wouldn't I have to say under those circumstances it was a

23  frivolous claim?

24          MR. SHAW:  I think if the hypothetical you're posing

25  you have somebody who's so removed that the governor wasn't

1    part of, let's say, the prison system, some prisoners bringing

2    some claim, it's just saying, you know --

3            THE COURT:  Just because someone happens to be a

4    subsidiary or have some affiliation doesn't necessarily make

5    that affiliate liable under a lawsuit.  It depends.

6            I mean, you can't say just because somebody's an

7    affiliate of somebody, therefore, they're immune from a

8    fraudulent joinder analysis, can you?

9            MR. SHAW:  No.  But if we allege that they

10   participated, then, you know, that's what makes it not

11   frivolous and it's an allegation that is plausible on its face.

12   I mean, we didn't get the name from anywhere.

13           They're not saying that they're not in the affiliate

14   realm, they're not saying that they had no connection at all to

15   these websites.  They're just saying they didn't own and

16   operate them in a way that would make them liable under -- so

17   that's our --

18           THE COURT:  So what I would have to do is look in

19   detail at -- compare the complaint, look at the exact

20   allegations, and review in detail the affidavits and

21   declarations to make that decision.

22           MR. SHAW:  Yes, Your Honor, we appreciate --

23           THE COURT:  See if it falls into the category of being

24   frivolous or not colorable.

25           MR. SHAW:  Exactly, Your Honor.  We'd appreciate that.

1  And if you do it with that standard --

2         THE COURT:  I understand what the analysis has to

3  be.

4         MR. SHAW:  With that standard in mind, exactly,

5  because that's the standard.

6         And then moving on to the class action under CAFA.  I

7  think Your Honor asked the question that I was wondering in my

8  own mind, which is, you know, what if we brought it for ten

9  people?

10        I mean, what's the vehicle that's being used here to

11 bring these cases, and the vehicle is -- it's Daniel's Law.

12 It's a plenary action under Daniel's Law.  Daniel's Law has

13 none of the hallmarks of a class action.  And that's what the

14 CAFA statute asks Your Honor to look at, is are we using

15 some vehicle, some mechanism that is essentially a class

16 action?

17        You know, exactly, if we -- I think that they would

18 agree with me that if somebody did not have an -- if an

19 assignment was not given to Atlas, that that person's not part

20 of the case.

21        So it seems to me that we're not representing anybody

22 else in this courtroom who is not -- who hasn't given an

23 assignment or an assignment hasn't been effectuated.  We're not

24 trying to represent absent parties in that sense, in the sense

25 of a class action.  We're not representative for people who we

1    don't have an assignment for.

2            So I don't think this looks like a class action in

3    the way that the CAFA courts -- the CAFA statute's addressed

4    to.

5            Then moving backwards to the mass action and really

6    the *Hood* case, we understand why they don't want to apply *Hood*.

7    *Hood* very specifically says you look to the language in the --

8    *Hood* is interpreting the language of a statute and it's doing

9    it very clearly.

10            They're trying to say that *Hood* is only limited to the

11    parens patriae situations.  They haven't put forth any case

12    that suggests that it should be so limited.  We've put some

13    examples.  He could criticize the examples, but at least

14    they're examples where it was not in the situation of

15    parens patriae.  That's what we were trying to put before the

16    Court.

17            But I also think if you look back at *Hood* and take a

18    look at exactly what happened there, the -- I guess it was

19    the defendant, not the state, tried to make the argument that

20    the state could also fit in CAFA under this other statute

21    where it's the general public.  They tried to make the

22    argument that the status of the state being a state makes it

23    somehow different, makes this case somehow different under

24    CAFA.

25            And I think the Supreme Court said, no, we don't

1  have to consider that, we don't have to consider that it's a

2  parens patriae, that's not the distinguishing factor in this

3  case; what we're doing here is interpreting the statute and

4  the language of the statute, and inviting inquiries behind

5  who the named plaintiff is, is not something that fits

6  within the definitions and the intendment of this part of the

7  statute.

8        The court said maybe you do that under collusion and

9  under 1359, but you don't do it under this mass action

10  provision.

11        So all of the other arguments that they're making

12  about collective actions and things would require Your Honor to

13  do some gymnastics to avoid *Hood* that we just don't think Your

14  Honor should do or to take you there.

15        And then getting all the way back to the kind of

16  collusion point and where this all started, I think Your Honor

17  was -- I appreciate now when you asked about the first step in

18  the analysis, about whether the assignment is real, whether

19  Atlas can be in this court, because apparently that runs

20  through all of these arguments.  And I didn't appreciate

21  that -- I thought that they were conceding that the assignments

22  are real and valid, at least in the sense that Atlas has

23  standing to be in this court, that Atlas has the ability to be

24  in this court, and that all of the questions that they're

25  trying to raise about who's the real party in interest were

1    kind of secondary.

2            But I do think now that that's a really important

3    point.  I don't think they could get around *Sprint.*  I don't

4    think they could get around the first step of the analysis,

5    which is Atlas is the party that's here.

6            THE COURT:  Well, they can always get around the first

7    step because the first step is whether somebody's a real party

8    in interest or standing, or however you want to characterize

9    it.

10           But even if so, then you have to determine whether

11   there's collusion.  I mean, nobody said in the *Kramer* case that

12   the assignee wasn't a real party in interest.  I don't think

13   the court went off on that.  Even if you are a real party in

14   interest, that's not the end of the game.

15           MR. SHAW:  Exactly.

16           THE COURT:  You have to meet the second step.  Did you

17   manufacture jurisdiction because you maybe are a real party in

18   interest?

19           That isn't -- the fact that you're a real party in

20   interest doesn't get you off the *Hood.*

21           MR. SHAW:  Exactly.  And that's why I didn't

22   appreciate the steps until you raised it.  But I think that's

23   exactly right, they didn't raise it in *Kramer*, in *Grassi*, *in*

24   *Attorneys Trust.*  They didn't end the inquiry there and say the

25   fact that this case involves assignment --

1        THE COURT:  You must have been a real party in

2   interest or you wouldn't have gotten to the second step, I

3   would think.

4        MR. SHAW:  Exactly.  So Atlas is here, it is a real

5   party in interest.

6        Then you have to say, what is the other -- is there

7   some other aspect of it that you disregard that or you need to

8   look to the covered people?  And that's where they try to

9   analogize this situation to *Grassi* and *Attorneys Trust* and

10  such.  This doesn't look like any of those cases.

11       I mean, considering *Grassi*, you had a plaintiff who

12  had a cause of action against a foreign company.  And then

13  after it had this cause of action accrued, it wanted to bring a

14  case and it assigned its interest then for the specific purpose

15  of avoiding -- for adding a party for avoiding jurisdiction in

16  federal court.

17       Both parties came into court.  Both parties.  The

18  assignor and the assignee were both in court.  The assignor

19  controlled the litigation.  The assignor was the one doing all

20  the things.  It added the assignee to try to avoid

21  jurisdiction.  And that's where the Court kind of went through

22  the factors.

23       Same thing -- *Attorneys Trust* is kind of sui generis

24  because it's a really weird case where the attorney had

25  brought -- the same kind of facts where there was an assignment

1    after the cause of action had already accrued and they were

2    trying to avoid federal court.  But the strange thing about

3    that case was the assignor and the assignee were both in the

4    case.  They're the ones who brought the counterclaim

5    affirmatively.  They said in their papers that they didn't have

6    jurisdiction and diversity jurisdiction.

7           The case went all the way to the end.  And then they

8    lost, and then they said, oh, by the way, we shouldn't be here.

9    And that's where the court kind of went through the facts.  It

10   just doesn't really look anything like this case.

11          So then if you look at exactly what this case looks

12   like, clearly -- as we've said, the covered people do not

13   control this litigation.  Regardless of whether there's some

14   monetary part that might flow back to them, they're not

15   controlling the course of the litigation.

16          THE COURT:  How about this whole issue of the

17   injunction which has been raised?

18          In other words, there's an assignment, and if money is

19   collected by Atlas, a certain amount of the money will be

20   provided to the covered person.

21          Now, what about the injunctive aspect?  In your

22   complaint you not only ask for actual damages, punitive

23   damages, but you also ask for injunctive relief.  Isn't that a

24   little different than monetary relief that does the -- does

25   Atlas have any interest in obtaining injunctive -- let's assume

1    for the moment you collect money from a defendant, you give a

2    certain amount of it back to the assignor pursuant to your

3    agreement, and then the defendant continues to publish the

4    names.

5            Does the assignee, Atlas, then have a right to go

6    into court, or an obligation to go into court and get an

7    injunction against the data broker for continuing to publish

8    the names?

9            MR. SHAW:  I would think that would be derivative of

10   the initial claim but -- and I think even our complaint kind of

11   makes the equitable relief kind of coincide with the monetary

12   relief.  I don't think they're necessarily different.

13           But kind of more fundamentally, is that really

14   different than the assignor -- sorry, as the assignee in the

15   *Long John Silver's* case?  Right?  This was a franchise company

16   that had a bunch of franchisees that had their -- you know,

17   arranged to have their roofs done in one uniform fashion, and

18   then to bring the lawsuit --

19           THE COURT:  Yeah, but in the *Long John* -- and I have

20   read it -- I know they were asking for monetary relief against

21   the people that were putting the roofs on the --

22           MR. SHAW:  Well, they also wanted nice blue roofs in

23   the end, and they were going to force them to do that.  I think

24   there was some injunctive relief aspect to it.

25           THE COURT:  Was there an injunctive relief aspect?

1   I don't specifically remember, I must say, whether they were --

2          MR. SHAW:  I hope I'm not overstating it, I just

3   think that --

4          (Simultaneous speakers.)

5          THE COURT:  What if you just want to get money to

6   repair the roofs?

7          MR. SHAW:  Well, they wanted the roofs -- and I also

8   think they wanted the roofs repaired.

9          THE COURT:  Right, but that's monetary.  I don't think

10  they wanted the people who did such a bad job to do the

11  repairs.  I think they wanted to get somebody else.  So I don't

12  know that that case involved an injunction.

13         So the question is here, how does the fact that you

14  seek injunctive relief, does the assignor then have a right to

15  seek injunctive relief on behalf of the covered person?  In

16  other words, do -- the assignee generally steps into the shoes

17  of the assignor.  We all -- that's general concept.

18         MR. SHAW:  Right.

19         THE COURT:  So then does the assignee have the right

20  to seek injunctive relief as well as to get damages?

21         MR. SHAW:  I think they have the right to seek it,

22  whether they're entitled to it is a different question, but I

23  think for purposes of trying to determine --

24         THE COURT:  You mean entitled because they don't have

25  standing or entitled because there may not be facts which

1    satisfy the requirements for an injunction?

2            MR. SHAW:  The latter.  I think that the covered

3    persons have assigned over all of their rights under Daniel's

4    Law to Atlas, injunctive and monetary.  It may be that the

5    benefits -- if Atlas is able to actually obtain an injunction,

6    meets all the equable requirements that a court would require,

7    it may be that benefits flow back to the assignor, just like

8    some portion of money flows back to an assignor in some

9    way.

10           But the causes of action, the claims, whatever rights

11   they have under Daniel's Law have been assigned.

12           THE COURT:  So what happens in a situation where Atlas

13   obtains a thousand dollars -- let's assume there was a

14   violation of the statute -- and then -- and the data broker

15   pays the money and so forth, and then two weeks later continues

16   to publish the names.  Atlas could go in and seek an

17   injunction on behalf of the covered persons, is that what

18   you're saying?

19           MR. SHAW:  That's an interesting hypothetical.  I

20   don't know whether that would be considered a new claim that

21   you would need a new assignment for, or whether there's some

22   connection to the old claim that you could say it's contempt of

23   some type of -- you know, something that arises out of the

24   prior judgement.

25           I would think, you know, there may be some

```
 1   circumstances where you would need a new assignment
 2   and some circumstances, if it's related to the old activity,
 3   that Atlas could still bring it, that it's already been
 4   assigned over.
 5         But either way, you know, if you're looking at the
 6   totality of the circumstances to try to figure out whether
 7   there was some strategem to destroy jurisdiction, that would
 8   only be one part of it.  And even there you could see that
 9   there's some factual questions about it.
10         Atlas doesn't -- we as attorneys here for Atlas do not
11   represent the covered people, we didn't represent them when
12   they signed up for Atlas.
13         THE COURT:  Didn't represent --
14         MR. SHAW:  We don't represent the assignors, the
15   covered people who assigned their claims.  We're not the same
16   lawyers for them.
17         THE COURT:  Right.
18         MR. SHAW:  They're all these, you know, policemen and
19   others out there who assign their claims.  We don't represent
20   them and we didn't represent them.  Again, Atlas controls the
21   litigation.
22         Another issue that Your Honor touched on is, you know,
23   is there some relationship between these parties that
24   pre-existed these claims, and we would say yes.  Covered people
25   sign up to use Atlas at some point in time when they're
```

1    interested in doing so.  They get the full services that Atlas

2    provides, which is kind of educational; other services that are

3    separate from Daniel's Law in kind of investigating places

4    where their information might be.  There's services that

5    Atlas provides to these people.  They have a relationship for

6    that.

7         One part of that relationship, which occurs after they

8    sign up for service, is they may choose to send notices for

9    takedown notices for Daniel's Law.  If they do, then there has

10   to be a time -- notices get sent out, as we've talked about in

11   other context, and then some time later after the ten days goes

12   by, it may be, if the facts are there to support it, that Atlas

13   then sets up the assignment.  And then only after that can a

14   claim be brought if one is going to be brought in court.

15        So there's a relationship between these parties

16   separate from the claim that's being brought in court, and that

17   kind of makes it similar, I think, to -- more similar to

18   something like *Long John Silver's* case with the roofs and the

19   franchisor than it does to *Grassi* or one of these other cases

20   that they cite where the only connection between the parties is

21   to show up to collect on their debt.  That's the only reason

22   for those assignments in some of these other cases that make

23   them somewhat suspect.  That's not what's happening here.

24   There's a much broader relationship.

25        And then, you know, they also raise an issue about

1  whether there's compensation paid for the assignment itself,

2  and I think that's too simplistic of a view of the relationship

3  between these parties.

4        Atlas is providing this service, as I mentioned,

5  educational and some other kind of investigatory and some other

6  services to these people, in addition to the Daniel's Law

7  service, and then they're getting paid -- they're providing

8  that service to these covered people.

9        That's Atlas's spending money, set up a whole kind of

10  business around this.  They're engaging in a legitimate

11  business that costs them a lot of money.  That's the

12  consideration that they're providing to other officers writ

13  large.  They don't have a fee schedule that kind of breaks

14  out --

15        THE COURT:  Do they have a right to collect their

16  counsel fees from the assignors?

17        MR. SHAW:  That's also a little bit contrived.

18  Ultimately if there's money received in the case, then they

19  will subtract out their attorney's fees on those particular

20  cases, but they're separately paying lawyers for their own --

21        THE COURT:  No.  But Daniel's Law, as I understand it,

22  provides counsel fees for the prevailing attorney; is that

23  correct?

24        MR. SHAW:  It does.

25        THE COURT:  So in other words, you collect a thousand

1  dollars liquidated damages from the data broker, you then have

2  a right to collect your counsel fees from the data broker,

3  correct?

4        MR. SHAW:  Correct.

5        THE COURT:  So what is the provision that requires the

6  covered persons to pay your counsel fee?

7        MR. SHAW:  It's part of the assignment and service

8  agreement between the parties.  So it's in addition -- it's

9  separate from anything that we would get directly from --

10       THE COURT:  All right.  You win the case, you -- as I

11  say, you recover the thousand dollars, you give the covered

12  person 65 percent, so that's $650 -- right? -- 65 percent of a

13  thousand dollars.

14       MR. SHAW:  Right.

15       THE COURT:  You collect your counsel fees.

16       Then you have a right to deduct from that $650 further

17  counsel fees?

18       MR. SHAW:  Well, I may have to have my counsel kind of

19  explain the detail for it, but in a broader picture, it's true

20  that some money will -- we're trying to get all of the money

21  flowing to the covered people if they recover.

22       THE COURT:  Not all of the money, the $650 -- right?

23  -- out of a thousand.

24       Because you're going to keep 35 percent, correct?

25       MR. SHAW:  Atlas will, correct.

 1            THE COURT:  I don't mean you personally.  Atlas, your

 2  client.

 3            MR. SHAW:  Yes.

 4            THE COURT:  And your client is going to collect the

 5  counsel fees if they win, are entitled to it under statute.

 6            But now let's assume you lose the case, do you go

 7  after the covered person for the counsel fees you expended in

 8  doing that?

 9            MR. SHAW:  No.  And that's the point.  That's exactly

10  right.

11            THE COURT:  Well, what does --

12            MR. SHAW:  Atlas eats it.  That's why Atlas has

13  costs --

14            THE COURT:  When does the covered person have to pay

15  counsel fees to Atlas?  That's why I'm -- it's been raised by

16  the other parties, and I'm just interested in understanding it.

17  It may or may not be relevant to the remand.

18            MR. SHAW:  I think only if there's a recovery.

19            THE COURT:  Now that it's been raised --

20            MR. PARIKH:  Your Honor, may I address that question

21  directly?

22            THE COURT:  Go ahead.

23            MR. PARIKH:  The covered people never pay counsel

24  fees, Judge.  It's a misnomer.  The idea that the defendants

25  have raised that the covered person somehow owes counsel fees

1  is just not true.

2       Atlas is fully responsible for the attorney's fees for

3  prosecuting these actions.  Your Honor is correct that Daniel's

4  Law provides that if a covered person is successful in

5  establishing a violation, that they're entitled to recover

6  their counsel fees.  So for example, if a covered person's

7  information was disclosed ten times and there's ten violations

8  by one data broker, they're entitled to a $10,000 reward for

9  that, they would get those fees.

10           THE COURT:  Right.

11           MR. PARIKH:  If Atlas pursues as an assignee, those

12  ten claims against the data broker, then Atlas recovers those

13  counsel fees.  If that occurs and Atlas gets the award of

14  $10,000, then $6,500 goes to the covered persons, Atlas gets

15  $3,500 and recovers whatever it expended in counsel fees.

16  There is no additional monetary exchange between the assignor

17  and Atlas for attorney's fees.

18           And that's why the assignment is complete, Your

19  Honor.  It's a complete assignment because once the entire

20  claim is assigned, there is no control over the litigation,

21  there's no expenditure, there's no risk by the covered person

22  in terms of pushing the litigation forward with regards to

23  that.

24           THE COURT:  But there was some reference to

25  the --

```
 1          MR. PARIKH:  There was, Your Honor.

 2          THE COURT:  -- language in the service

 3    agreement.

 4          MR. PARIKH:  And I think what they're referring to,

 5    Your Honor, is that in the service agreement it says that if

 6    there is an award or a settlement, that first off of that is

 7    monies -- so for example, let's say there was a $1 million

 8    reward and there's $100,000 in legal fees, but only 50,000

 9    were awarded in the lodestar analysis, that the other 50,000

10    of attorney's fees may come off the top of that million-dollar

11    award, and then the remainder of that would then be

12    split 35 percent and 65 percent pursuant to the terms of

13    service.

14          So I think what the defendants are arguing is that

15    there is some monetary amount that could be awarded as part of

16    a damages award that could go to pay for attorney's fees for

17    prosecuting these actions.

18          THE COURT:  All right.  As I said, I'm not sure how

19    relevant it is to what we're doing here today, but anyhow,

20    thank you for illuminating the issue.

21          MR. PARIKH:  Absolutely.

22          MR. SHAW:  And I think each time we have these

23    hearings, we go through a little bit of the -- you know, how it

24    actually works, so we all learn a little bit more of it.

25          THE COURT:  Right.
```

1          MR. SHAW:  But I guess the last point I would make is

2     if, in fact, you disregard Atlas's citizenship and you look to

3     the citizenship of all of the officers, which I believe is what

4     they're suggesting should happen here, it turns out that

5     there's three officers at least who are citizens of Delaware,

6     have citizenship in Delaware.

7          THE COURT:  Where is that in the record?

8          MR. SHAW:  That is not in the record yet, Your Honor.

9     As we've been exchanging these lists, we've been kind of

10    looking through them much more carefully.  And if it's

11    something that we could submit to the Court, we would like to

12    do that.

13         THE COURT:  You mean three of the assignors you're

14    talking about?

15         MR. SHAW:  Assignors, exactly.

16         THE COURT:  Not the named parties?

17         MR. SHAW:  Correct, three of the assignors.

18         THE COURT:  Okay.

19         MR. SHAW:  And I'm saying, if the exercise that they

20    want to take the Court through is disregard Atlas because it's

21    collusive, because the assignments are collusive, therefore,

22    you need to then look at the citizenship of all of the --

23         THE COURT:  The 19,000.

24         MR. SHAW:  The 19,000, I guess in the theory that you

25    would then still need complete diversity amongst the 19,000 and

```
 1    the defendant.  We don't think that exists because there are at

 2    least three people whose citizenship is Delaware.

 3            And if we can submit that declaration to that effect

 4    to the Court, we would like to.

 5            THE COURT:  All right.  Anything further anybody?  Mr.

 6    Stio?

 7            MR. PARIKH:  If I could just add one more thing, Your

 8    Honor?

 9            THE COURT:  Sure, you can go, and then Mr. Stio.

10            MR. PARIKH:  Thank you, Judge.  Rajiv Parikh for the

11    plaintiffs.

12            Judge, on the injunctive relief component that you

13    asked some questions of Mr. Shaw that was raised.

14            THE COURT:  Right.

15            MR. PARIKH:  So as Your Honor knows, Daniel's Law

16    provides for several categories of damages, and one of those is

17    equitable relief or other relief that the Court deems

18    appropriate.  And Your Honor is correct that within the

19    complaint Atlas and the individual plaintiffs have sought

20    injunctive relief in addition to monetary damages.

21            The concept there, Judge, is that Atlas is providing a

22    service, providing multiple services to these covered persons.

23    That includes some covered people who never actually transmit

24    Daniel's Law requests.  Right?

25            So there are a multitude of services that are
```

1    being provided.  But for those who have submitted these

2    non-disclosure requests to the defendants and where the

3    defendants have failed to do that, Atlas's role is to

4    effectuate, essentially, the service that it's providing.

5              And so the injunctive relief that's being requested is

6    on behalf of Atlas.  Now, it has the benefit of providing the

7    covered person with what they've ultimately sought from the

8    outset, which is to enforce their privacy and safety rights

9    under Daniel's Law, but it's Atlas that's requesting that

10   injunctive relief in order to effectuate the services that it's

11   providing pursuant to the terms of service, as well as pursuant

12   to the assignment that it's received against those individual

13   entities.

14             THE COURT:  But it's one thing to collect

15   damages because Atlas is going to have some money in its

16   treasury, so to speak.  What about the injunctive relief aspect

17   of it?

18             Because Atlas would be suing the data broker to

19   prevent them from disclosing the home addresses and unlisted

20   phone numbers of covered persons.  Now, they clearly have an

21   interest in obtaining money.

22             Is the interest the same with respect to injunctive

23   relief in preventing the disclosure of the home addresses and

24   phone numbers?

25             MR. PARIKH:  It is, Judge, because that's one of the

1    main purposes that Atlas exists.  It exists to effectuate these

2    privacy rights and to allow people to effectuate them in a very

3    unique way.

4              THE COURT:  So you're saying because of the

5    assignment, they stand in the shoes of the assignor for all

6    purposes, including injunctive relief, and that they would have

7    standing not only to obtain damages but also to obtain

8    injunctive relief, even though it's not Atlas's name per se

9    that is being disclosed?

10             MR. PARIKH:  That's right, Judge.

11             THE COURT:  Or address or phone number of Atlas?

12             MR. PARIKH:  That's right, Judge.  And that's

13   the -- you know, the notion behind this assignment provision.

14   Right?

15             If an individual police officer or 19,000 of them had

16   to file small claims actions in New Jersey Superior Court in

17   order to have their names removed from the 75 or, in this case,

18   the 35 remand defendants' websites, then that individual person

19   would be, you know, going and filing each of those individual

20   lawsuits over and over and over again, which is essentially

21   impractical.

22             The idea of the assignment -- and Your Honor hit the

23   nail on the head before.  You could have a police department or

24   a group of police officers that combine together assign the

25   rights to one of them who now has to be the public face of a

 1   lawsuit where what they're ultimately trying to do is have

 2   their information removed from the public sphere for their own

 3   protection and safety and privacy.

 4          THE COURT:  And the Daniel's Law does permit

 5   assignments, it doesn't limit it -- it's a full assignment?

 6          MR. PARIKH:  It is, Your Honor.

 7          THE COURT:  In other words, whatever bundle of rights

 8   belongs to the covered person are assigned to Atlas?

 9          MR. PARIKH:  That is correct, Judge.  That's right.

10   Or any other person that would be assigned --

11          THE COURT:  Or any assignee?

12          MR. PARIKH:  Correct.  That's right.

13          The last point, Judge, just with respect to Thomson

14   Reuters.  So we didn't -- I don't believe we had an opportunity

15   to engage in discovery with those two defendants on the

16   fraudulent joinder issue.  I know there were multiple

17   conferences here about subject matter jurisdiction discovery,

18   but it really was discovery from the defendants to the

19   plaintiffs.

20          THE COURT:  Well, there was -- I have to look up my

21   order, but I did permit discovery.  That's why the remand

22   motions have been -- we're dealing with them after the

23   constitutional issue.

24          MR. PARIKH:  I understand.

25          THE COURT:  Obviously, the remand comes first.  If I

1   don't have jurisdiction, then that's the end of it.

2           MR. PARIKH:  Correct, Judge.  And all I wanted to

3   say for the record, because I believe counsel said, you know,

4   they didn't seek discovery, we did ask Thomson Reuters.

5   We said, all right, well, tell us who the right defendants are.

6   If you believe we have the wrong defendants, tell us who the

7   entities are that when you look at your privacy policy that

8   you post online and your global website that you have,

9   which defendants are the ones that are the appropriate

10  defendants for this lawsuit, and they wouldn't provide that

11  information.

12          THE COURT:  Well, they have not challenged the other

13  defendants.  In other words, the entire case wouldn't be

14  dismissed.  It's only in one case one defendant and in the

15  other case two defendants, and there are other defendants

16  that are not being challenged on the ground of fraudulent

17  joinder.

18          MR. PARIKH:  That's right, Judge.  And Thomson Reuters

19  in particular says that none of the defendants that you've

20  named in this lawsuit are the proper parties.  And so we said,

21  okay, well, let us know who discloses the data and information,

22  who holds it?

23          THE COURT:  Yes, but they haven't raised fraudulent

24  joinder with respect to all defendants.

25          MR. PARIKH:  Only with two of them, Judge, the two

 1   that are based in Delaware.

 2            THE COURT:  Right.  Exactly.

 3            MR. PARIKH:  So I just wanted to point that out for

 4   the record, Your Honor.

 5            THE COURT:  Thank you.  Mr. Stio?

 6            MR. STIO:  Thank you, Your Honor.  I'll be really

 7   quick.

 8            Your Honor, the first thing I want to point out is --

 9   and you hit the nail on the head -- these assignments aren't

10   complete and absolute because of the injunctive relief, and

11   I'll tell you why.

12            Your Honor, you pointed out --

13            THE COURT:  Does it say that they are?

14            MR. STIO:  Well, I'm going to tell you why they're

15   not.  You pointed it out.  Atlas says, I get injunctive relief

16   with regard to everything related to the non-disclosure

17   request.

18            THE COURT:  Yeah.

19            MR. STIO:  They -- and I don't believe they're in

20   any way entitled to it, but they get an order for injunctive

21   relief that benefits all of the class members.  A week later,

22   as you said, there's someone who sees their information

23   online against one of the defendants against who injunctive

24   relief is.

25            Mr. Shaw said, well, that person may be able to give

 1    another assignment confirmation and we can bring suit.  I think

 2    that it shows that it's not complete because, A, Atlas,

 3    purported complete assignee, can bring the claim or application

 4    to enforce that injunction against the defendant.  The

 5    individual who receives all of that relief could bring their

 6    own separate action against that same defendant, and the case

 7    never ends.  So it's not complete --

 8            THE COURT:  Well --

 9            MR. STIO:  -- as to the injunctive relief.

10            THE COURT:  Wouldn't that also be true as to

11    damages?  Let's assume Atlas settles and then -- it's an

12    interesting question under Daniel's Law.  Let's assume Atlas

13    collects a thousand dollars and then three weeks later nothing

14    has been removed.

15            Is it a -- does Atlas have the obligation to go after

16    them again or does the covered person have to file a new

17    assignment?  Is it a new cause of action or is it a continuing

18    violation?

19            I mean, these are all very interesting --

20            MR. STIO:  And that's precisely why Atlas is not the

21    real party in interest.  And I'm going to give you one more.

22    And it's not a hypothetical, it's actually in this case.

23            Mr. Shaw said the covered people brought a class

24    action against LexisNexis, but that class action arises out of

25    the non-disclosure requests that were sent by Atlas that

1    purportedly were assignment confirmations.  If it was a

2    complete assignment, the case should be dismissed against

3    LexisNexis.  It's not.  It's not a complete assignment because

4    not only of the substantial interest, not only because of a

5    lack of consideration, not only because no prior interest.  The

6    case never ends the way this is structured.  So the assignment

7    is not complete.

8            The second point I'd like to make to Your Honor is

9    with regard to *Sprint*.  And, Your Honor, I do think that it

10   would be a mistake of law to apply *Sprint* in a diversity

11   jurisdiction context.

12           And I say that because there is language in *Sprint*

13   where the Supreme Court gives two examples of situations that

14   if it were before this Court, I think the Court would say under

15   *Attorneys Trust* and *Grassi* factors, yeah, that's an improper

16   assignment.  Why --

17           THE COURT:  You mentioned *Sprint*.

18           MR. STIO:  Yeah.

19           THE COURT:  And I know that the Supreme Court,

20   Justice Breyer goes through the history of it, assignments

21   and so forth.  And he cites a number of old Supreme Court

22   cases.

23           Were any of those diversity cases?

24           MR. STIO:  There's no mention of 1332 in the

25   opinion.

```
 1            THE COURT:  No, I'm not talking about the mention of
 2   1332(e).  They do cite a number of old decisions, which I'll
 3   have to look at, which Justice Breyer says are consistent with
 4   the decision in *Sprint*.
 5            My question is, were any of those diversity cases that
 6   went to the Supreme Court, as opposed to federal question
 7   cases?
 8            MR. STIO:  I don't know the answer to that.  I don't
 9   know the answer.
10            THE COURT:  I know *Sprint* was not a diversity case, I
11   agree with that.
12            MR. STIO:  Yeah.  But here's --
13            THE COURT:  I mean, that would be illuminating to see
14   if any of those was a --
15            MR. STIO:  And, Your Honor, I'm happy to do that and
16   send a letter.
17            THE COURT:  We can do that too.
18            MR. STIO:  But one of the things I want to point the
19   Court's attention to is on page 2544, the court talks about
20   two --
21            THE COURT:  What case are you talking about?
22            MR. STIO:  This is *Sprint*, the *Sprint* opinion.  The
23   court talks about two instances where they believe that
24   standing would still exist.
25            One is, for example, the agreement could be rewritten
```

1  to give the aggregator a tiny portion of the assigned claim

2  itself, perhaps only a dollar or two.  That would be a partial

3  assignment.  The court seems to say standing exists.  And I

4  would submit to this Court that in that situation where there's

5  a dollar of a thousand-dollar recovery and all of the other

6  factors are present, which we believe they are, diversity can

7  be ignored as to Atlas.

8       The second example that they give is, or the payphone

9  operators might assign all other claim to a trust and then they

10 pay a trustee, perhaps the same aggregator, to bring suit on

11 behalf of the trust.

12      I would submit to the Court that if they gave it to a

13 trustee who was a Delaware corporation that was intended to

14 prevent someone from getting into court, that would be a

15 situation where you can disregard diversity of citizenship but

16 yet there's still standing.

17      And that second analysis goes to the McCassin(Sic)

18 case that Your Honor discussed, getting a trustee in another

19 state who is not a real party in interest.

20      Second point I want to make, Your Honor, is *Long John*

21 *Silver's* did not involve injunctive relief.

22      THE COURT:  I didn't think it would.

23      MR. STIO:  If you look at page 755 of the opinion.  I

24 mean, and if you think about it, right, you have all these

25 franchisees who have roof damage, are they going to wait three

```
 1   years to get the roof fixed?

 2           THE COURT:  The last person they're going to go after

 3   is the fellow who didn't correctly do the repairs.

 4           (Laughter.)

 5           MR. STIO:  Right.

 6           On attorney's fees, Your Honor, the attorney's fees,

 7   the net amount of 65 percent comes out of the individuals.  And

 8   I agree, it's an instance where attorney's fees are not awarded

 9   fully or, where I think it would come into play, is if there's

10   a settlement.  If these cases settle and there's not a specific

11   statement about attorneys fees, it's coming out of the pocket

12   of the covered people.  So to say that the covered people

13   aren't on the hook here is not entirely accurate.

14           Finally, Your Honor, and I think the Court is aware of

15   this, Atlas has said at different points the standard here is

16   clear and convincing.  It's not.  As to diversity jurisdiction,

17   the standard is preponderance of the evidence.  And I would

18   direct the Court's attention to McCann, Third Circuit case, 458

19   F.3d 281.

20           And if you have any questions, I'm happy to answer

21   it.

22           MR. KIMREY:  Good afternoon Judge.  Blaine Kimrey,

23   Whitepages and Hiya.  Just a few things quickly.

24           Again, Sprint is not precedent for this case on

25   1332(a).  1332 isn't mentioned at all in that case.  It is a
```

1  standing case.  It is not a case addressing whether an entity

2  is a real party in interest for purposes of diversity

3  jurisdiction.

4         THE COURT:  Well, those concepts are really

5  interchangeable, aren't they, to a large extent --

6         MR. KIMREY:  No.

7         THE COURT:  -- real party in interest and standing?

8         MR. KIMREY:  No.

9         THE COURT:  All right.  Tell me why.

10         MR. KIMREY:  Standing has to do with injury in fact

11  under Article III and the ability to bring a suit.  So we're

12  not saying --

13         THE COURT:  See, there was no injury in fact to the

14  assignee in *Sprint* if that's the standard.

15         Was there?  No.

16         MR. KIMREY:  The court found that there was

17  standing in that case, but that's not dispositive as to the

18  standard --

19         THE COURT:  The standard, refused of the assignor, but

20  there was no injury in fact to the assignee.

21         So you have to look to the assignor, correct?

22         MR. KIMREY:  I'm not saying, Your Honor, that the

23  Supreme Court got the *Sprint* decision right on Article III

24  standing.

25         THE COURT:  Well, we can debate that for a long time,

```
 1   but I don't have the luxury of deciding whether they were right

 2   or wrong.

 3         MR. KIMREY:  Well, it just doesn't matter with respect

 4   to diversity jurisdiction, Your Honor.  The real party in

 5   interest for purposes of diversity jurisdiction and standing as

 6   in Article III standing are distinct intellectual concepts.

 7   And I think that you picked up on this, Your Honor, in asking

 8   whether any of the cases that were cited in *Sprint* were

 9   diversity cases, because *Sprint* is a federal question case, and

10   I definitely think that we would like additional briefing on

11   that.

12         THE COURT:  I don't think you need to do that.  We

13   can look those up and determine whether -- I mean, many of

14   them were very old cases.  And as I say, I don't know the

15   answer, but many of the cases that -- there weren't a lot of

16   federal questions decades and decades ago, so -- but we'll

17   see.  I don't know whether they were federal questions or

18   not.

19         MR. CHEIFETZ:  I do know the answer and I'm happy to

20   address that after Mr. Kimrey addresses that.

21         THE COURT:  We'll get the answer.  Great.

22         MR. KIMREY:  So I know that this Court, like any

23   district court, any circuit court is looking for binding

24   precedent that would guide this Court at the Supreme Court.

25         THE COURT:  Right.
```

1      MR. KIMREY:  On this question, diversity jurisdiction

2  under 1332(a), there is no binding precedent before the Supreme

3  Court and it's a stretch to apply *Sprint* here.

4      There is circuit level authority.  There's the

5  *Attorneys Trust* case, there's the *Grassi* case, there's also the

6  LNY case, which is at 2023 WL 662167.  That's a Fifth Circuit

7  case, 2023 WL 662167, from 2023.

8      Coming here today, I was curious what the most recent

9  circuit court reliance on *Grassi* and *Attorneys Trust* was and

10  whether it was material to the Court.  And this case is, in

11  fact, material and it's from 2023.  And what it says is -- it

12  finds that the assignee's citizenship should be disregarded

13  because the assignment was invalid -- or no, no.  I am sorry.

14  That's not correct.  Because the assignee had conceded that --

15  that the assignee was a nominal party.  Okay.  And I know Atlas

16  hasn't done that here.

17      THE COURT:  No, right.

18      MR. KIMREY:  But it relies on *Grassi* and it doesn't

19  cite the *Sprint* decision, as far as I'm aware.  I have to look

20  at that, but I'm pretty sure it doesn't cite *Sprint*.

21      So you have two Fifth Circuit decisions, *Grassi* and

22  *LNY,* and you have the Ninth Circuit decision that support this

23  notion that Atlas's citizenship can be disregarded and that

24  motive, while a potential factor for consideration, is not a

25  dispositive factor.  Right?

1          And this -- so again, I agree with Mr. Stio, reliance

2   on *Sprint* here would be a mistake of law.  I also think that

3   the two-step process that you've articulated, Your Honor, is

4   not actually the test.  It's not a two-step process.  You don't

5   look at real party in interest and then collusion.

6          It's a real party in interest test overall that

7   includes within it this notion of consideration of motive, as

8   set forth in the *Attorneys Trust* case and the *Grassi* case.  So

9   to say that there's a two-step process also would be a mistake

10  of law.  I obviously don't know what you're going to do so --

11          THE COURT:  Neither do I.

12          (Laughter.)

13          MR. KIMREY:  Especially today.  But I just -- I would

14  like to make a request, Your Honor, that if the Court is

15  inclined to side with Atlas as to the 1332(a) argument, which

16  the Court should not do, but if the Court is, the Court should

17  put the magic language in the order under 28 U.S.C. 1292

18  exercising its discretion on what we've identified as two

19  potential mistakes of law for consideration by the Third

20  Circuit.  And --

21          THE COURT:  Well, you do have the right to go to the

22  Court of Appeals on the 1332(d).

23          MR. KIMREY:  Yes.

24          THE COURT:  They don't have to take it, I think it's

25  discretionary.

```
 1           MR. KIMREY:  That's right.

 2           THE COURT:  But not under 1332(a).

 3           MR. KIMREY:  Right.  Under 1443, the certification

 4  request would just go to the appellate court for CAFA, either

 5  mass action or class action, but for the simple Strawbridge vs.

 6  Curtiss diversity --

 7           THE COURT:  That would be 1292 --

 8           MR. KIMREY:  That would be a 1292.  And the Third

 9  Circuit takes a very liberal view of the Court's discretion in

10  that regard, and that's at 940 --

11           THE COURT:  A liberal view of what?

12           MR. KIMREY:  You have -- in the Third Circuit,

13  district court judges have much more discretion under 1292 as

14  to certifying remand decisions.

15           THE COURT:  They have the final word on that.

16           MR. KIMREY:  Yeah.  They still have to approve it as

17  well.

18           THE COURT:  Yeah.

19           MR. KIMREY:  That's right.  So it's a two-step process

20  for 1332(a), base, remand, certification --

21           THE COURT:  I've already said that on the

22  constitutional issue if anybody wants a 1292(b), I certainly --

23  if I decide --

24           MR. KIMREY:  That's right.

25           THE COURT:  -- in a way that's not -- that says the
```

 1  statute is valid, then I'll permit you to take it to the Court

 2  of Appeals.  Otherwise, you would have to wait until the end of

 3  the case.

 4          MR. KIMREY:  Right.  So I think it would be

 5  appropriate for the Court to take the same approach with

 6  respect to the jurisdictional issue.

 7          Finally, these three alleged Delaware assignors that

 8  we just heard about today for the first time, the Court should

 9  disregard that because it's not part of the briefing.  The

10  citizenship of these people --

11          THE COURT:  It's a little late for that.

12          MR. KIMREY:  Right.  And also they're not parties

13  anyway.  So disregarding Atlas's citizenship for purposes of

14  diversity doesn't automatically make those people parties in

15  the caption of the complaint, so they're not relevant for

16  purposes of diversity jurisdiction.

17          THE COURT:  All right.

18          MR. KIMREY:  That's it, Your Honor.  Thank you.

19          THE COURT:  Anyone else?  It's getting late, but

20  I'll -- somebody's got to have the last word.

21          MR. CHEIFETZ:  Thank you, Your Honor.

22          David Cheifetz.  I appreciate the time.  I know it's

23  getting late.

24          On *Sprint*, because the Court asked, I would like to

25  answer that question.  One of the old cases that *Sprint* cites

1   is the *Waite* case that I referred to earlier, that's W-A-I-T-E,

2   and that was a diversity case.  And the court in *Sprint*

3   referred to that case and said that, in a unanimous decision

4   there, the *Waite* court ultimately held that federal courts

5   could not hear that suit because the amount of controversy

6   requirement of diversity jurisdiction would not have been

7   satisfied if the bondholders had sued individually.  The

8   assignors got sued individually.

9          That's the principle I referred to earlier and why

10  *Sprint* is very important to the mass action argument, because

11  *Sprint* cites *Waite,* and *Waite* recognizes the principle that a

12  mass assignee should be as akin to multiple plaintiffs.

13         And that's why it ties back to *Hood.*  Because they say

14  that -- in part three of *Hood*, *Hood* -- the Supreme Court in

15  *Hood* rejected this background inquiry and that that wasn't a

16  background principle Congress could have known about or

17  intended.

18         And, importantly, the Supreme Court in *Hood* said that

19  it makes sense to infer Congress's intent to incorporate a

20  background principle into a new statute like CAFA where the

21  principle has previously been applied in a similar manner.  In

22  *Hood*, the real party in interest inquiry had to do with whether

23  you disregard someone's citizenship or not.  It didn't have to

24  do with numerosity.

25         And so the court in *Hood* said that's a principle that

1    Congress wouldn't have had to take into account.  But in *Waite*,

2    which is a 125-year-old Supreme Court case, the principle is

3    that mass assignees are akin to multiple plaintiffs.  And that

4    is a governing principle, therefore, that, according to *Hood*,

5    it would have made sense for Congress to incorporate when it

6    passed CAFA.

7         Now, two more quick points.  Mr. Shaw, I think, said

8    that in *Hood* the Supreme Court said that the parens patriae

9    context was not a distinguishing factor in that case.  The

10   Supreme Court didn't say that.  In fairness, I've acknowledged

11   the Supreme Court didn't expressly limit its holding, but it

12   certainly didn't affirmatively say that the parens patriae

13   context wasn't the distinguishing factor.

14        And finally, on that point -- and I didn't get to

15   cover this earlier -- the reason that the case is so

16   distinguishable is not just on the facts.  Look at the

17   reasoning in *Hood*.  Look at each of the reasons the Supreme

18   Court gives in *Hood* to reach its holding, that it would result

19   in all these administrative difficulties if we looked beyond

20   the named plaintiffs.

21        On page 170 of *Hood*, the court said:  It is difficult

22   to imagine how the claims of one set of unnamed individuals

23   could be proposed for joint trial on the ground that some

24   completely different group of named plaintiffs share common

25   questions.

1          That concern has no application here whatsoever

2     because you have one complete set of known people.

3          The second rationale the Supreme Court gave on

4     page 171:  If the term "plaintiffs" is stretched to include all

5     unnamed individuals with an interest in the suit, then

6     determining the individual amount in controversy for each

7     plaintiff becomes an administrative nightmare.

8          Also, completely inapplicable here because in *Hood* the

9     court would have had to guess which Mississippi citizens were

10    even involved.  It couldn't even identify them to determine the

11    amount in controversy, and here that's not an issue.

12          THE COURT:  Why isn't it here?

13          MR. CHEIFETZ:  Because Atlas stands in the shoes of

14    19,000 known individuals, they've alleged in the complaint, as

15    we said in our notice of removal, sufficient amount in

16    controversy.  Atlas stands here representing those known

17    parties.

18          THE COURT:  But if they're standing in the shoes, does

19    it make it a mass action, if you're standing in the shoes of,

20    as opposed to representing, in effect, similar claimants?

21          MR. CHEIFETZ:  That's precisely what makes it a mass

22    action.  Atlas is -- grammatically I'm not sure if that's right

23    -- Atlas is, in effect, each covered person.  They have joined

24    those claims in a single suit.  They stand here as Atlas as

25    assignee of Mr. John Doe 1, Atlas as assignee of Mr. John Doe

1   2, and on and on 19,000 times.

2        And the third rationale the Supreme Court gives for

3   why the argument there wasn't acceptable is that under CAFA for

4   transfer motions:  "A majority of plaintiffs in the action must

5   request transfer."

6        So the Supreme Court said if plaintiffs means all of

7   these unknown Mississippi citizens, who we don't even know

8   exists, it would be surpassingly difficult for a court to

9   decide whether to transfer a case because we don't know who

10  consents or who wants transfer.

11       That's completely not applicable here because of the

12  reason Your Honor identified.  Atlas stands in the shoes of all

13  the covered persons, can speak for it with respect to any

14  decisions or information necessary to be provided to the Court,

15  including some hypothetical transfer motion.

16       So again, for all of those reasons, the reasoning in

17  *Hood* is completely inapplicable here and it wouldn't make sense

18  to extend it, therefore, to the very different facts of this

19  case.  Thank you.

20       THE COURT:  Thank you.  Anything else from anyone?

21  Thank you all for coming.

22       Oh, yes, go ahead.

23       MR. CHRISTIE:  I'm sorry, really quickly.  Scott

24  Christie on behalf of Black Night Technologies, 24-4233.

25       Not only are the potential Delaware plaintiffs

 1  inapplicable, as Your Honor has noted, but it is not clear at

 2  all that any non-New Jersey covered person, obstensible covered

 3  person, can sue or has standing under Daniel's Law.

 4        Because as Your Honor knows, it is limited to relief

 5  for current and former law enforcement in New Jersey and it is

 6  by --

 7        THE COURT:  Well, you could be a former police officer

 8  in New Jersey and move to Delaware or Pennsylvania.

 9        MR. CHRISTIE:  But it covers home addresses.  Are we

10  then equating --

11        THE COURT:  Oh, you mean their home addresses may be

12  in Delaware now or -- I see what you're saying.

13        MR. CHRISTIE:  Exactly, Judge.

14        So by no means should Your Honor be of the disposition

15  that any non-New Jersey resident has standing here on top of

16  the other reasons why you should disregard --

17        THE COURT:  All right.

18        MR. KIMREY:  -- the Delaware, potential Delaware

19  plaintiffs.

20        THE COURT:  All right.

21        MR. SHAW:  Your Honor, just very quickly.

22        THE COURT:  I'll give you one minute.  Go ahead.

23        MR. SHAW:  Adam Shaw for the plaintiffs.  It's a

24  retired person who lives in Delaware.  And I just wanted to say

25  the Lexis case is not a Daniel's Law case, it's a -- it's not a

1   class action based on Daniel's Law, it's a class action based

2   on a different statute.

3          MR. PARIKH:  Judge, can I just raise one housekeeping

4   issue?

5          THE COURT:  Yes.

6          MR. PARIKH:  Pursuant to local Civil Rule 5.3, we're

7   required to file a motion to seal with respect to the remand

8   briefing by this Wednesday.  I think we've conferred with

9   defense counsel, if the Court would permit us one extra week to

10  file that motion --

11         THE COURT:  What is so secret that we have to

12  seal --

13         MR. PARIKH:  There's some proprietary issues, Judge,

14  and then there's safety issues.  I, for one, on my personal

15  cell phone last week got a threatening phone call from the

16  principal of one of the defendant companies.  I raised it with

17  that lawyer.  There are also those similar types of harassments

18  and threats that are being made against Atlas employees.

19         And so in terms of sealing from the public docket some

20  of the portions of the deposition transcript where people's

21  names or information or where they live is to be sealed, and

22  then also just some proprietary issues with respect to Atlas's

23  cyber security efforts and then some of its service terms that

24  are non-public information.

25         THE COURT:  You're not seeking to seal the argument

1    here today, are you?

2          MR. PARIKH:  No, Your Honor, just parts of the

3    exhibits to the briefing that contain deposition transcripts.

4          THE COURT:  And they're not under seal at the

5    moment?

6          MR. PARIKH:  They are under seal, but we're required

7    under the local rule to file a motion to make them sealed

8    permanently.

9          THE COURT:  All right.  File whatever you need to

10   file.

11         MR. PARIKH:  Thank you, Judge.

12         THE COURT:  Thank you very much.

13         (Matter adjourned at 12:58 p.m.)

14         - - - - - - - - - - - - - - - - -

15

16         I certify that the foregoing is a correct transcript

17   from the record of proceedings in the above-entitled matter.

18

19   */S/ Sharon Ricci, RMR, CRR*
     *Official Court Reporter*

20

21   *October 22, 2024*
           *Date*

22

23

24

25